**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **SEMICONDUCTOR GLOBAL SOLUTIONS,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | **CASE NO. 1:24-cv-00923-DII** |
| **v.** | § | |
| | § | |
| **CAPITAL ASSET EXCHANGE AND** | § | |
| **TRADING, LLC; CAE ONLINE LLC;** | § | |
| **RYAN FRANZKE JACOB, Individually;** | § | |
| **and JEFFREY SCOTT ROBBINS,** | § | |
| **Individually,** | § | |
| | § | |
| *Defendants.* | § | |

<u>**PLAINTIFF'S FIRST AMENDED COMPLAINT**</u>

NOW COMES, SEMICONDUCTOR GLOBAL SOLUTIONS ("SGS"), and files this First Amended Complaint as against CAPITAL ASSET EXCHANGE AND TRADING, LLC; CAE ONLINE LLC; RYAN FRANZKE JACOB, individually; and JEFFREY SCOTT ROBBINS, individually (collectively, "CAE"), and would for cause of action respectfully show the court the following:

**PARTIES AND SERVICE OF PROCESS**

1.      Plaintiff, Semiconductor Global Solutions ("SGS"), is a private company organized in 2018 under the laws of the People's Republic of China, where its principal place of business is located. As such, it is deemed to be a citizen of the People's Republic of China. 28 U.S.C.A. § 1332 (c)(1).

2.      Defendant, Capital Asset Exchange and Trading, LLC ("CAET") is a California limited liability company registered to do, and doing business in, the State of Texas, with its

principal place of business located at 401 Congress Avenue, Suite 1760, Austin, Texas 78701. CAET has made an appearance in these proceedings through its counsel.

3.      Defendant, CAE Online LLC ("CAEO"), is a California limited liability company doing business in the State of Texas as or through Capital Asset Exchange and Trading, LLC. CAEO has made an appearance in these proceedings through counsel for CAE.

4.      Ryan Franzke Jacob ("Jacob"), is the President, Managing Member and, on information and belief, the alter-ego of the CAE entities. Jacob is a resident of the State of Texas and has made an appearance in these proceedings through his counsel.

5.      Defendant, Jeffrey Scott Robbins ("Robbins"), is the President, Managing Member, and, on information and belief, the alter-ego of the CAE entities. Robbins is a resident of the State of Colorado and has made an appearance in these proceedings through his counsel.

6.      CAE has the following additional agents relevant to this matter: (1) Austin Gill, the Chief Operating Officer and Executive Vice President of CAE. Upon information and belief Mr. Gill resided in Austin, Texas at times relevant to this matter, presently resides and/or is domiciled in Denver, Colorado, but operates as a full-time employee, and is under the control, of CAE; (2) Gergely Tóth, a Specialist for the Settlement and Compliance Department of CAE. Upon information and belief Mr. Tóth operates as a full-time employee, and is under the control, of CAE; (3) Andrew Hung, an Account Executive for CAE. Upon information and belief Mr. Hung operates as a full-time employee, and is under the control, of CAE; and (4) Amity Yang, an Account Executive for CAE. Upon information and belief Ms. Yang operates as a full-time employee, and is under the control, of CAE.

7.    At all relevant times, Defendants were agents of CAE and/or were acting in concert with CAE, and in doing the things alleged herein were acting with the knowledge and consent of CAE within the course and scope of their respective agency relationships.

## JURISDICTION AND VENUE

8.    This Honorable Court has diversity jurisdiction under 28 U.S.C.A. § 1332(a) because each defendant is a citizen of a different state than plaintiff, and the amount in controversy is more than $75,000, not counting interest and costs of court. Jurisdiction is also proper because, on information and belief, Defendant(s) have committed tortious acts in Texas; agents of CAE made misrepresentations to individuals while in Texas for the benefit of Defendant(s) and to the detriment of Plaintiff; and Defendant(s) are holding or have diverted monies rightfully belonging to the Plaintiff to third parties other than Plaintiff. The ultimate effect of these schemes was to perpetrate a fraud upon Plaintiff to drain monies from the Plaintiff, who has suffered millions of dollars in losses as a result.

9.    Venue is proper because the operative contract between CAE and SGS does not contain a choice of forum; because Defendant Jacob is a resident of Travis County, Texas; because CAET maintains its principle place of business in Travis County, Texas; and because CAEO regularly engages in business in Texas through CAET. Therefore, venue in the Western District of Texas is both proper and convenient.

## FACTUAL BACKGROUND

### *The Parties*

10.    Founded in 2018, SGS is a private venture capital-backed company that provides comprehensive upgrade and optimization solutions for *used/refurbished* semiconductor equipment.

11.    It was publicly reported in China in 2018 that SMIC International Holdings Limited ("SIHL") is an investor in SGS since its inception. SIHL's parent company is Semiconductor Manufacturing International Corporation ("SMIC"). SMIC is widely known to be a partially state-owned publicly listed Chinese pure-play semiconductor foundry company. It is the largest contract chip maker in mainland China. As a result, SMIC is deemed a *partially* regulated entity under government regulations to be discussed *infra*.

12.    CAET and its distribution arm CAEO (collectively, "CAE") purports to be a global physical commodities trading firm addressing the secondary semiconductor market. Of relevance to this matter, CAE is in the business of reselling used industrial equipment to customers in the semiconductor market.

13.    Based on the public record, CAE has an interesting history of transferring assets and changing names dating back to 1999. Of relevance, CAEO was first incorporated in Delaware on April 7, 1999, and cancelled voluntarily on July 20, 2004. It seems to have been reincorporated by 2006 in California, where it initiated and defended against litigation through at least 2009. Perhaps to evade creditors, on August 11, 2008, Defendant Jacob filed a certificate of amendment to change the name of CAEO to CAET. But the company's legal troubles continued. On January 28, 2011, CAET merged with another company formed by Jacob called Pioneer Resources, LLC, with the intent to make the name of CAET "disappear." Pioneer Resources, LLC has since been dissolved. On May 14, 2015, Jacob proceeded to register CAET in Texas, adding Defendant Robbins as an additional managing member.

14.    The nucleus of the corporate Defendants' operations are headquartered in Austin, Texas. An online search of Defendant "Capital Asset Exchange and Trading LLC" leads one to "Caeonline.com" at https://caeonline.com wherein Defendants identify Austin, Texas as "CAE

Texas HQ" and announce that "[r]egardless of physical location, department, working from one of our offices remotely…all CAE employees are a part of our integrated network…We operate as a single unit." CAE's LinkedIn Page further states that "CAE is based in Austin, TX."

***The Regulations***

15.    In 2018, Congress passed the Export Control Reform ACT ("ECRA"), which charged the executive branch of the U.S. Government with using export controls to regulate specified items to be sold to specified entities or locations in the interest of national security. As a result of this act, the United States Department of Commerce's Bureau of Industry & Security ("BIS") imposed regulations on transactions that relate to exporting, reexporting, and transfers of specified items to specified countries, including China. These specifications were reduced to publicly available lists.

16.    An item is defined by the applicable regulations as "commodities, software, and technology." Items intended for military-intelligence end use are restricted. Financial activities have not been listed as an EAR item. Items and activities that are not subject to the Export Administration Regulations ("EAR") are outside the regulatory jurisdiction of the EAR and are not affected by these regulations.

17.    Similarly, regulations administered by the Office of Foreign Assets Control ("OFAC") implement controls on embargo transactions with certain foreign countries, including China. The regulations require that any item subject to the regulations be *licensed* for export, reexport, or transfers. They *do not* categorically prohibit such activities.

18.    In consideration thereof, semiconductor equipment destined for China requires licensing. To the extent SGS is affiliated with SMIC, licensing requirements may also be invoked.

19.    To prevent violations of these national *licensing* regulations *by U.S. persons* seeking to do business relating to restricted items with regulated countries, the BIS imposes "Know Your Customer" due diligence guidance within the EAR to be completed *before* a U.S. person enters a contract for the export, reexport, or transfer of items to a regulated country.

20.    Through its website, and in marketing sales/services to potential customers such as SGS, CAE represents that:

a.    Through its "rigorous diligence, compliance, logistics, and price matching, [it] deliver[s] safety, results, and superior financial outcomes to [their] clients."

b.    That CAE "marshals a tailored due diligence process, robust compliance, and risk management, internal physical logistics, and provides a uniquely safe and secure transaction."

c.    That CAE is "accountable for every transaction — we audit or inspect every asset and make sure it shows up as promised. CAE seeks to remove the risks associated with sourcing and monetizing physical assets in its market."

***The Parties' History***

21.    Relying upon CAE agents' representations regarding CAE's expertise in conducting due diligence and compliance in such transactions, SGS contacted CAE for its second-hand equipment needs.

22.    Beginning in October 2021 through July 2022, SGS and CAE engaged in twelve such transactions without issue. SGS provided all documents requested by CAE during their prior dealings, and CAE never raised any red flags.

*CAE Induces SGS to Enter the Subject Contract*

23.     In December 2022, SGS was in the market for two used/salvaged scanning electron microscopes (the "Equipment") for refurbishing and re-sale to an end user located in China. Electron microscopes are considered semiconductor equipment, so they may be subject to the Regulations.

24.     Trusting CAE on this delicate transaction based on their prior dealings, SGS reached out to CAE to find suitable equipment for a specified budget of $2,000,000. On or about November 29, 2022, CAE issued to SGS an Invoice Order for this purpose.

25.     Soon thereafter, CAE advised it had located the desired equipment and invited SGS to place a bid for its purchase. In doing so, CAE concluded the Invoice Order and requested a separate proposal from SGS for the actual purchase of the Equipment it had allegedly located. SGS placed a bid for $2,000,000.

26.     CAE accepted the offer (but could have rejected it), and a new contract was formed on December 7, 2022 – the Purchase Order (the "Contract"). The Contract contained an integration clause stating that it was the "entire and only agreement between the parties." Austin Gill signed the Contract on behalf of CAE.

27.     When CAE agents Tóth and Hung advised SGS that it had won its bid, they again assured SGS that the Equipment could be delivered by CAE to China within three days of purchase given the prowess of its compliance department with regard to the Regulations, its ability to secure export licensing for the Equipment quickly, and its ability to export equipment promptly. Accordingly, the Contract provides that CAE was to sell and deliver the Equipment to SGS, with a delivery date of December 10, 2022.

28.    CAE's representations were made to solicit an upfront payment from SGS of the full $2,000,000 purchase price.

29.    Relying upon CAE's assurances, SGS pre-paid CAE $2,000,000 on December 9, 2022. However, CAE failed to deliver the equipment by December 10, 2022, as agreed.

***CAE's Scheme Continues to SGS' Detriment***

30.    On or about December 13, 2022, three days after CAE's contractually promised delivery date, CAE first requested that SGS complete an Ultimate Consignee/End User Statement form and an Ultimate Consignee/End User Statement, Additional Information form ("EUS") before the Equipment could be exported per the Regulations. SGS promptly completed and returned the forms.

31.    On January 6, 2023, CAE acknowledged receipt of the EUS form and advised that CAE was "making arrangements for the removal of the equipment" and completing a "logistics survey" before a delivery schedule could be provided.

32.    On January 17, 2023, CAE advised SGS that CAE is working with vendors to get the best crating quotation for the project. CAE advised that it estimated release of one of two pieces of Equipment in early February 2023, with crating to occur within a week thereafter. CAE estimated the release of the second piece of Equipment by June 2023, using the same procedure.

33.    On February 1, 2023, CAE confirmed the following schedule for the first piece of Equipment:

Decontamination: 2/27-28
Deinstallation: 2/28 -3/02
Removal/transfer to packing facility for a CCIC Quality Inspection and packing: 3/3

34.    Over the next couple of months, CAE engaged SGS in discussions about the process and cost of deinstallation and decontamination of the Equipment for export. Concerned

about whether the Equipment was operational given the delays and vague information being provided by CAE, SGS requested an inspection of the Equipment. However, CAE first stalled and then stated that the Equipment had already been de-installed, decontaminated, and locked down by its own personnel. When SGS requested to inspect the same for packing purposes, CAE refused to provide the exact location of the Equipment and denied SGS access under the guise of continued quality inspections.

35.    By April 2023, SGS was growing restless. CAE's *three-day delivery promise* was in its *fourth month* with no end in sight. Perhaps sensing SGS' frustration, CAE reported for the first time that its compliance review was taking longer than expected. When SGS requested more details, CAE failed to respond.

36.    By mid-May, the end user for the Equipment was ready to back out. SGS notified CAE of this potential loss, but CAE indicated it was still working on compliance issues. As a result, the original end user for the Equipment terminated its agreement with SGS.

37.    On June 8, 2023, SGS advised CAE that if it is unable to perform under the Contract, a refund of SGS' purchase price was demanded. CAE, through its agents Gill, Tóth, and Hung, evaded the request and advised it was still working on compliance.

38.    By July 2023, in an effort to mitigate its damages resulting from CAE's delay, SGS was able to secure a new potential end-user for the Equipment out of Singapore. As CAE's request, SGS submitted a new EUS form to CAE. It was not until August 9, 2023, that CAE reported to SGS that their alleged compliance hurdles involved the previous end user, and CAE expected the process to go more quickly moving forward. Yet, for the next two months, CAE's pattern of delays due to their alleged compliance review continued.

39.     Losing trust in CAE's ability to deliver on its promises, SGS proposed taking possession of the Equipment in the U.S. instead, but CAE refused.

40.     Suspecting that CAE had defaulted and/or had no intention of performing under the Contract, on October 20, 2023, SGS again advised CAE that SGS would require a refund of its $2,000,000 purchase price and restitution for the 10-month delay caused by CAE if CAE could not complete its compliance review and release the Equipment to SGS. To this end, SGS again requested proof of the existence and functionality of the Equipment and, again, CAE, through its agents Gill, Tóth, and Hung, refused to allow SGS to inspect the Equipment.

41.     Approximately *one year* after contracting with SGS on the assurance that the Equipment would be promptly delivered, in December 2023, CAE explicitly refused to perform under the Contract, citing the Regulations. Notably, the export control restrictions and regulations upon which CAE relied to excuse their agreed performance have been in place since October 7, 2022; that is, before CAE entered the subject contract with SGS.

42.     On March 16, 2024, a formal demand was issued to CAE seeking delivery of the Equipment no later than March 29, 2024, or a refund. CAE declined to take either action based on the Regulations, at first. Faced with the fact that the Regulations do not prohibit export of the Equipment, but only impose licensing requirements, CAE pivoted to assert SGS' affiliation with SMIC as the basis for their contractual breach.

43.     SMIC has been a partially restricted entity on the EAR and other lists since December 23, 2020. SGS' affiliation with SMIC has been a matter of public information since 2018. Therefore, CAE could and should have foreseen that it may not be able to deliver the Equipment it promised to SGS *before* it entered into the Contract with SGS at the end of 2022 and advised SGS accordingly. They did not.

10

44.     Instead, CAE promised SGS it could and would deliver the Equipment on a truncated timeline; obtained $2,000,000 from SGS under this false pretense; and strung SGS along for over a year before refusing to deliver the Equipment or issue a refund to SGS of its purchase price. This lawsuit follows.

### FIRST CLAIM FOR RELIEF
### (Breach of Contract – All Defendants)

45.     SGS re-alleges and reiterates the foregoing paragraphs as if set forth fully herein.

46.     The elements of a breach of contract action are: 1) the existence of a valid contract; 2) performance or tendered performance by the plaintiff; 3) breach of the contract by the defendant; and 4) damages sustained by the plaintiff as a result of the breach. *Valero Mktg. & Supply Co. v. Kalama Int'l L.L.C.*, 51 S.W.3d, 345, 351 (Tex. App.—Houston [1st Dist] 2001, no pet.); *see also Wright v. Christian & Smith*, 950 S.W.2d 411,412 (Tex. App.—Houston [1st Dist.] 1997, no writ).

47.     The Purchase Order is a valid contract as between SGS and CAE for the purchase/sale of the Equipment. SGS performed under the Contract by paying CAE $2,000,000 for the Equipment. CAE breached the Contract by failing to deliver the Equipment to SGS.

48.     CAE's breach has damaged SGS in an amount exceeding **$2,000,000.00,** together with expectancy, reliance, and restitution damages, as well as, SGS' reasonable and necessary attorney's fees and costs.

49.     On information and belief, CAE is the alter-ego of Jacob and Robbins. Jacob and/or Robbins used CAE for the purpose of perpetrating an actual fraud against SGS, primarily for the benefit of themselves and/or CAE. Therefore, piercing the corporate veil applies, and Jacob, Robbins, and CAE are all liable. TEX.BUS.ORGS.CODE § 21.223.

## SECOND CLAIM FOR RELIEF

### (In the Alternative, Repudiation/Anticipatory Repudiation – All Defendants)

50.     SGS re-alleges and reiterates the foregoing paragraphs as if set forth fully herein.

51.     Repudiation consist of words or actions by the contracting party that it is not going to perform the contract in the future. *Sava Gumarska in Kemijska Industria D.D. v. Advanced Polymer Scis., Inc.*, 128 S.W.3d 304, 310 (Tex. App.—Dallas 2004, no pet.). This is shown by abandonment, renouncing the contract, or refusal to perform the contract. *Id*. To constitute a repudiation, the repudiating party must "absolutely and unconditionally" refuse to perform the contract without just excuse. *Tendeka, Inc. v. Nine Energy Serv. LLC*, No. 14-18-00018-CV, 2019 Tex. App. LEXIS 10908, at *1 (Tex. App.—Houston [14th Dist.] Dec. 17, 2019, no pet.) *Nat'l Farmers Org. v. Bartlett & Co., Grain*, 560 F.2d 1350, 1356 n.11 (8th Cir. 1977).

52.     CAE and SGS had a valid contract between them – the Purchase Order. SGS performed its contractual obligations. CAE materially breached and/or repudiated the Contract when it failed or refused to secure licensing on the Equipment; refused to export the Equipment to China; and refused to release the Equipment to SGS within the United States. Although CAE cited to the Regulations as an excuse to non-performance, the same do not constitute good cause because the alleged issues were foreseeable, known, or should have bene known prior to CAE contracting with SGS.

53.      CAE's repudiation of the Contract resulted in the following damages that SGS seeks in this lawsuit: actual damages of $2,000,000, consequential damages, lost profits, and reasonable and necessary attorney's fees.

54.     On information and belief, CAE is the alter-ego of Jacob and Robbins. Jacob and/or Robbins used CAE for the purpose of perpetrating an actual fraud against SGS, primarily for the

benefit of themselves and/or CAE. Therefore, piercing the corporate veil applies, and Jacob, Robbins, and CAE are all liable. TEX.BUS.ORGS.CODE § 21.223.

## THIRD CLAIM FOR RELIEF

### (In the Alternative, Federal Common Law of Promissory Estoppel – All Defendants)

55.    SGS re-alleges and reiterates the foregoing paragraphs as if set forth fully herein.

56.    The elements of a claim for promissory estoppel are: (a) the defendant made a promise to plaintiff; (b) the plaintiff reasonably and substantially relied on the promise to its detriment; (c) the plaintiff's reliance was foreseeable by the defendant; and (d) injustice can only be avoided by enforcing the defendant's promise. *Bailey v. City of Austin*, 972 S.W.3d 180, 193 (Tex.App – Austin 1998, pet. denied).

57.    Under the doctrine of promissory estoppel, a person may be bound by a promise he reasonably believed would induce action or inaction and that did induce the action or forbearance, if injustice can be avoided only by enforcement of the promise. *"Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934, 937 (Tex. 1972). Promises under the theory of promissory estoppel may also be implied or implicit. *In re Texas Mortg. Services Corp.*, 761 F.2d 1068, 1076, 1985 U.S. App. LEXIS 30083, *21-22. 49.

58.    Jacob and Robbins through CAE, its employees, agents, and servants, expressly promised SGS that CAE would clear compliance, obtain appropriate licensing for the Equipment, and deliver the same to China in three days, provided SGS immediately paid to CAE $2,000,000.

59.    SGS reasonably relied on CAE's promises based on CAE's purported expertise in compliance matters relating to the Regulations and acted on said reliance by paying to CAE $2,000,000 upfront and in full for the Equipment.

60.     Implicit in CAE's acceptance of the funds was its promise to perform as indicated; that is, by clearing compliance, obtaining appropriate licensing for the Equipment, and delivering the same to China within three days of payment.

61.     SGS' reliance was foreseeable, and indeed expected by CAE, because of the parties' pre-existing business relationship during which no concerns about SGS' affiliations in China were raised and goods were delivered to China without issue.

62.     SGS substantially relied on CAE's promises and assurances to its detriment. But for CAE's representation, SGS would not have remitted $2,000,000 to CAE upfront and in full, nor would SGS have tolerated CAE's year-long delay tactics. Because SGS relied on CAE's promises, it has been deprived of $2,000,000; the Equipment; the ability to procure the Equipment from another source; the income to be earned from the sale of the Equipment to SGS' end-user; and SGS' goodwill. Wherefore, justice can only be done by enforcing Defendants' promise to SGS.

## FOURTH CLAIM FOR RELIEF

### (Fraudulent Inducement and Fraudulent Misrepresentation – All Defendants)

63.     SGS re-alleges and reiterates the foregoing paragraphs as if set forth fully herein.

64.     Fraudulent inducement and misrepresentation claims require the plaintiff to prove: (a) a misrepresentation; (b) that defendant knew the representation was false and intended to induce plaintiff to enter into the contract through that misrepresentation; (c) that plaintiff actually relied on the misrepresentation in entering into the contract; and (d) that plaintiff's reliance led to plaintiff to suffer an injury through entering into the contract. *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 277, 2012 U.S. App. LEXIS 1251, *34.

65.     A fraudulent misrepresentation need not be overt, written/spoken words; it may be implied or implicit. *See, Coombs v. Frazzio*, 386 S.W.2d 650, 653, 1965 Tex. App. LEXIS 2320,

*5-6.). "[W]hen one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentation." *AT&T Universal Card Servs*., 246 F.3d at 404. *See also, Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435, 1986 Tex. LEXIS 949, *8, 29 Tex. Sup. J. 280 (Tex. March 19, 1986).

66.     Jacob and Robbins through CAE, its employees, agents, and servants, made a material misrepresentation(s) to SGS. Specifically, Tóth and Hung advised Sophia Shi, Echo Lan and others from SGS that CAE (i) had secured the desired equipment; (ii) had a dedicated compliance department was able to effectively address the Regulations, secure export licensing for the Equipment quickly, and export equipment to SGS' end-user in China; (iii) could and would deliver the Equipment as directed by SGS on a truncated timeline due to its purported expertise; that is, the Equipment would be delivered by CAE to China within three days of purchase, provided that SGS pay to CAE $2,000,000 upfront and in full for the Equipment; (iv) obtained the full purchase price of $2,000,000 from SGS under these false pretenses; but then (v) strung SGS along for over a year before refusing to deliver the Equipment to China and refusing to issue a refund to SGS of its purchase price.

67.     SGS contends that the Equipment was not secured by CAE and, even if they were, SGS funds for the purchase and delivery of same have been misappropriated for the benefit of Defendants, including the individual Defendants who control the totality of CAE operations.

68.     Under the pretext of managing CAE to help foreign companies overcome the complexities of regulatory requirements surrounding the shipment of goods to China, Defendants Jacob and Robbins devised a scheme to use their company(ies) to prey on the trust and confidence of vulnerable companies such as SGS and abscond with millions of dollars in cash for unsecured and/or undelivered equipment.

69.     Jacob and Robbins through CAE, its employees, agents, and servants, knew or should have known that the statements made to SGS by Tóth and Hung were false because CAE is not new to this business, The Regulations have been in effect for years, and CAE had prior dealings with SGS and knew or should have known its customer before entering a contract with same. CAE nevertheless intended to induce SGS to enter into the contract and pay $2,000,000 up front and in full through its misrepresentation(s).

70.     Yet, Jacob and Robbins through CAE, its employees, agents, and servants, made the representations without any intent to perform them, as evinced by CAE's inconsistent statements and runaround tactics meant to delay SGS' prosecution of its claims.

71.     Because intent to defraud is not susceptible to direct proof, it must be proven by circumstantial evidence. *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435, 1986 Tex. LEXIS 949, *8, 29 Tex. Sup. J. 280 (Tex. March 19, 1986).  As the Texas Supreme Court has held, *only "slight"* circumstantial evidence of fraud is necessary; when considered with the breach of promise to perform, that is sufficient to support a finding of fraudulent intent. *Id.*

72.     To the extent CAE intended to perform and was unable or later unwilling to do so, Jacob and Robbins through CAE, its employees, agents, and servants, remained silent for over a year before refusing to deliver the Equipment at all and refusing to refund to SGS its $2,000,000 paid for the Equipment, citing first to The Regulations in effect before the contract was entered with SGS and then to SGS' long-standing and well-known affiliation with SMIC as the reason.

73.     Jacob and Robbins through CAE, its employees, agents, and servants, intended and expected (or reasonably should have expected) that SGS would justifiably rely on the inducements, representations, statements of fact, promises to perform, and reassurances by CAE when entering

a Contract with CAE, and then delaying prosecution of its claims when CAE would not timely perform.

74.    The statements, assurances and representations of fact made through CAE, its employees, agents, and servants, were of such importance that SGS would not have agreed to contract with CAE and pay $2,000,000 upfront and in full but for the false statements and materially misleading inducements.

75.    As a direct and proximate result of such assurances, misrepresentations, and false statements and omissions of material fact, and SGS' reasonable reliance thereon, SGS has suffered actual damages, including economic losses, lost business opportunity, attorney's fees, interest, and other damages, direct and consequential, plus pre- and post-judgment interest as allowed by law and such other relief to which it may be legally and equitably entitled, including exemplary damages and attorney's fees.

76.    On information and belief, CAE is the alter-ego of Jacob and Robbins. Jacob and/or Robbins used CAE for the purpose of perpetrating an actual fraud against SGS, primarily for the benefit of themselves and/or CAE. Therefore, piercing the corporate veil applies, and Jacob, Robbins, and CAE are all liable. TEX.BUS.ORGS.CODE § 21.223.

### FIFTH CLAIM FOR RELIEF

#### (In the Alternative, Unjust Enrichment – All Defendants)

77.    SGS re-alleges and reiterates the foregoing paragraphs as if set forth fully herein.

78.    A person is unjustly enriched when he obtains a benefit from another by fraud, duress, or the taking of an undue advantage. *Ahmed v. Shah*, No. 01-13-00995-CV, 2015 Tex. App. LEXIS 390, at *15 (Tex. App.—Houston [1st Dist.] Jan. 15, 2015, no pet.) (citing *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)). A key element of unjust enrichment

is that the person sought to be charged wrongly secured or passively received a benefit. *Ahmed v. Shah* (citing *Villarreal v. Grant Geophysical, Inc.*, 136 S.W.3d 265, 270 (Tex. App.— San Antonio 2004, pet. denied). It is not enough that the person sought to be charged received some incidental benefit. *Id.* citing Bashara v. Baptist Mem'l. Hosp. Sys., 685 S.W.2d 307, 310 (Tex. 1985)).

79.    CAE accepted SGS' $2,000,000 under the guise of delivering the Equipment to China. However, CAE has failed to deliver the Equipment to China; release the Equipment to SGS in the United States; or even issue to SGS a refund of its purchase price failing CAE's performance, all to SGS' detriment in an amount exceeding $2,000,000.

## ALTER-EGO ALLEGATIONS AGAINST JACOB AND ROBBINS

80.    This case arises from fraud perpetrated by Defendants Jacob and Robbins against SGS using the company(ies) they operated. Under the pretext of managing CAE to help foreign companies overcome the complexities of regulatory requirements surrounding the shipment of goods to China, Defendants Jacob and Robbins devised a scheme to use their company(ies) to prey on the trust and confidence of companies such as SGS.

81.    Specifically, Defendants Jacob and Robbins instructed their agents, servants, and employees to use CAE to secure $2,000,000 from SGS in 2022 with no intention of procuring and/or delivering the Equipment being purchased. Instead, Defendants intended to, and did, gain possession of $2,000,000 of SGS funds, delay delivery for over one year, and then refuse to either deliver the Equipment or refund SGS' purchase price, arguing that the Regulations prevented them from doing so. Indeed, the Regulations did no such thing.

82.    Despite being well-aware of the Regulations before contracting with SGS to deliver the Equipment to an end user in China, Defendants misrepresented and used the existing

regulations as an excuse to abscond with millions of dollars belonging to SGS. Indeed, SGS is not Defendants' only victim.

83.     At all relevant times, as alleged more fully hereinabove, each Defendant acted as an agent, servant, employee, and/or alter-ego of the other Defendants, and in doing the things alleged herein acted within the course and scope of such agency, employment, and/or alter-ego in furtherance of the fraud upon SGS.

84.     Each of the Defendant's acts alleged herein was done with the permission and consent of each of the other Defendants.

85.     At all times relevant hereto, Defendants Jacob and Robbins were the alter-egos of Defendants CAET and CAEO, collectively CAE, and there exists, and at all times herein mentioned has existed, a unity of interest and ownership between Defendants such that any separateness between them has ceased to exist in that Defendants Jacob and Robbins completely controlled, dominated, managed, and operated the other Defendants to suit their convenience and fraudulent purpose.

86.     Specifically, at all times relevant hereto, Defendants Jacob and Robbins (a) controlled the business and affairs of CAE, including any and all of their affiliates; (b) commingled the funds and assets of the corporate entities, and diverted corporate funds and assets, including SGS' $2,000,000, for their own personal use or benefit; (c) disregarded legal formalities and failed to maintain arm's length relationships among the corporate entities; (d) inadequately capitalized CAE; (e) used the same office or business location and employed the same employees for all the corporate entities; (f) used the corporate entities as mere shells, instrumentalities or conduits for their fraudulent conduct; (g) manipulated the assets and liabilities between the corporate entities

so as to concentrate the assets in one (CAEO) and the liabilities in another (CAET); and/or (h) used the corporate entities to shield against personal obligations, and in particular the obligations as alleged in this Complaint.

87.    At all times relevant thereto, Defendants CAET and CAEO were not only influenced and governed by Defendants Jacob and Robbins, but there was such a unity of interest and ownership that the individuality, or separateness, of the individual Defendants and the corporate Defendants has ceased, and that the facts are such that an adherence to the fiction of the separate existence of these entities would, under the particular circumstances, sanction a fraud or promote injustice.

## CONDITIONS PRECEDENT

88.    SGS has performed all of the covenants and conditions of its Contract with CAE, except to the extent that such performance has been prevented, excused, hindered or waived.

## ATTORNEY FEES

89.    SGS is entitled to recover reasonable and necessary attorney's fees under its breach of contract claim and promissory estoppel claim. *Traco, Inc. v. Arrow Glass Co.*, 814 S.W.2d 186,193 (Tex. App. – San Antonio, 1991, writ denied). SGS is also entitled to recover reasonable and necessary attorney's fees as contemplated by Fed. R. Civ. P. 54, should it prevail on its cause(s) of action.

## CLAIM FOR PRE- AND POST-JUDGMENT INTEREST

90.    SGS is entitled to recover pre- and post-judgment interest on all damages that have accrued as of the date of judgement at the highest legal rate until paid.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff, SEMICONDUCTOR GLOBAL SOLUTIONS, respectfully prays that, upon final hearing of this matter, the Court enter judgment granting the following relief against the Defendants, jointly and severally:

a. Actual damages incurred in the amount of $2,000,000.00 under the Contract;

b. Economic losses and lost business opportunity to be proven at trial;

c. Expectancy, reliance, and restitution damages to be proven at trial;

d. Exemplary damages for the Defendant(s)' fraud in the amount of $500,000.00 or as otherwise deemed appropriate by the Court or Jury;

e. Reasonable and necessary attorney's fees as provided by law;

f. Pre- and post-judgment interest; and

g. Any other relief, legal or equitable, direct or consequential, to which SGS may show itself to be justly entitled.

Signed on September 27, 2024.

Respectfully submitted,

*/s/Henna Ghafoor* _____ .
HENNA GHAFOOR
FEDERAL BAR NO.: 2258471
TBN: 24079867
hghafoor@mp-lg.com
RENJIAN "ETHAN" ZHANG
*(USDC-SDTX Admission Pending)*
FEDERAL BAR NO.: 3856063
TBN: 24124466
ezhang@mp-lg.com
**MOSAIC Paradigm Law Group PC**

10370 Richmond Avenue, Suite 850
Houston, Texas 77042
Telephone: (281) 805-7169
Facsimile: (281) 805-7172

ATTORNEYS FOR PLAINTIFF,
SEMICONDUCTOR GLOBAL
SOLUTIONS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was hereby filed using the CM/ECF filing system, which served electronic notice of this pleading on all parties through their counsel of record.

*/s/Henna Ghafoor* .
HENNA GHAFOOR