1   WILLIAM J. FRIMEL (Bar No. 160287)
2   Seubert Frimel & Warner LLP
    1075 Curtis Street
3   Menlo Park, CA  94025
    Tel:  650.322.3048
4   Fax:  650.833.2976
    bill@sffwlaw.com
5
6   Attorneys for Defendants
    CAPITAL ASSET EXCHANGE & TRADING LLC,
7   CAE ONLINE LLC, RYAN JACOB, and JEFFREY
    ROBBINS
8
9                    UNITED STATES DISTRICT COURT
10
11                   NORTHERN DISTRICT OF CALIFORNIA
12
    SEMICONDUCTOR GLOBAL            Case No. 4:25-cv-04075-HSG
13  SOLUTIONS,
                                    **NOTICE OF MOTION AND MOTION BY
14              Plaintiff,          DEFENDANTS CAPITAL ASSET
                                    EXCHANGE & TRADING LLC, CAE
15       v.                         ONLINE LLC, RYAN JACOB, AND
                                    JEFFREY ROBBINS TO STAY ACTION
16  CAPITAL ASSET EXCHANGE &        PENDING DETERMINATION BY OFFICE
    TRADING LLC; CAE ONLINE LLC;    OF FOREIGN ASSETS CONTROL;
17  RYAN FRANZKE JACOB, individually; MEMORANDUM OF POINTS AND
    and JEFFREY SCOTT ROBBINS,      AUTHORITIES IN SUPPORT THEREOF**
18  individually,
                                    Hearing Date:  July 31, 2025
19              Defendants.         Hearing Time:  2:00 p.m.
                                    Courtroom:  2
20                                  Judge:  Hon. Haywood S. Gilliam, Jr.
21
22
23
24
25
26
27
28

DEFS.' MOT. TO STAY PENDING DETERMINATION BY OFFICE OF FOREIGN ASSETS CONTROL

1

### NOTICE OF MOTION

2      PLEASE TAKE NOTICE that, on July 31, 2025, at 2:00 pm, or as soon thereafter as

3  counsel may be heard, in the United States District Court for the Northern District of California,

4  located at Courtroom 2, 1301 Clay Street, Oakland, CA 94612, Defendants Capital Asset

5  Exchange & Trading LLC, CAE Online LLC ("CAEO"), Ryan Jacob and Jeffrey Robbins

6  (collectively, "Defendants") will and hereby do move to stay this action pending the

7  determination by the United States Treasury Department's Office of Foreign Assets Control

8  ("OFAC") regarding CAET's application for a license to refund the payment at issue in this

9  action by Semiconductor Global Solutions ("SGS").  This motion shall be based on this Notice,

10  the attached Memorandum of Points and Authorities, the Declarations of Ryan Jacob and William

11  J. Frimel, and such other and further material as may be submitted to the Court on or before the

12  date of the hearing in this matter.

13

### MOTION TO STAY

14      CAET moves to stay this action pending the determination by OFAC regarding CAET's

15  application for a license to refund the payment at issue in this action by SGS.

16

### ISSUE TO BE DECIDED

17      The issue to be decided is whether this action should be stayed pending the determination

18  by OFAC regarding CAET's application for a license to refund the payment at issue in this action

19  by SGS.

20  Dated:  May 28, 2025                              /s/ William J. Frimel

21                                                   WILLIAM J. FRIMEL
                                                     Attorneys for Defendants
22                                                   CAPITAL ASSET EXCHANGE & TRADING
                                                     LLC, CAE ONLINE LLC, RYAN JACOB, and
23                                                   JEFFREY ROBBINS

24

25

26

27

28

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ................................................................. 1

STATEMENT OF FACTS ..................................................... 2

    A.     The Relevant U.S. Export Regulations ........................ 2

        1.   The BIS maintains a list of entities that cannot receive certain types of equipment without a license ........................ 2

        2.   The EARs prohibit the export of any item subject to the EARs to semiconductor manufacturers in China ........................ 3

        3.   The EARs prohibit payments to "military-intelligence end users" ... 4

        4.   The EARs require CAET to inquire into the end use of restricted items ... 4

        5.   OFAC regulations prohibit the transfer of funds to entities considered threats to U.S. national security ........................ 5

    B.     The Parties' Transaction ........................................ 6

ARGUMENT ....................................................................... 7

I.     THIS ACTION SHOULD BE STAYED BASED ON THE PRIMARY JURISDICTION DOCTRINE ........................................ 7

    A.  OFAC's Determination Will Resolve an Issue Important to This Matter ... 7

    B.  The Issue Presented by the License Application Is Within OFAC's Jurisdiction ........................................ 8

    C.  The Relevant Regulations Require Agency Expertise and Uniformity ... 9

II.    THIS ACTION SHOULD BE STAYED BASED ON THE COURT'S DISCRETION TO CONTROL ITS DOCKET ........................ 10

    A.  If the Court Requires CAET to Refund SGS's Payment, CAET May Be Forced to Violate U.S. Export Regulations ........................ 10

    B.  Entering a Stay Will Not Meaningfully Prejudice SGS ................ 11

    C.  A Stay Would Be in the Public Interest ........................ 12

CONCLUSION ................................................................. 12

1

2                                 **<u>TABLE OF AUTHORITIES</u>**

3                                                                                          **Page(s)**

4    *In re 650 Fifth Ave.*, No. 08 Civ. 10934, 2013 WL 2451067 (S.D.N.Y. Jun. 6, 2013)     9

5    *ASCII Corp. v. STD Ent'mt. USA, Inc.*, 844 F. Supp. 1378 (N.D. Cal. 1994)             10

6    *Akeena Solar Inc. v. Zep Solar Inc.*, No. C 09-05040, 2010 WL 1526388 (N.D. Cal.
7    Apr. 14, 2010)                                                                         12

8    *Barrera v. Comcast Holdings Corp.*, No. 14-cv-00343, 2014 WL 1942829 (N.D. Cal.
     May 12, 2014)                                                                          1, 9
9

10   *Cal. Apt. Ass'n. v. San Diego Cty. Apt. Ass'n., Inc.*, No. 11cv300, 2011 WL 1002667
     (S.D. Cal. Mar. 18, 2011)                                                              11

11   *Chamber of Commerce v. Becerra*, 438 F. Supp. 3d 1078 (E.D. Cal. 2020)                11

12
     *Changji Esquel Textile Co. v. Raimondo*, 573 F. Supp. 3d 104 (D.D.C. 2021)             3
13

14   *Chevron U.S.A. Inc. v. Natural Resources Def. Council*, 467 U.S. 837 (1984)            9

15   *Clark v. Time Warner Cable*, 523 F.3d 1110 (9th Cir. 2008)                             7

16   *Clinton v. Jones*, 520 U.S. 681 (1997)                                                10

17   *Cortez v. Trans Union, LLC*, 617 F.3d 688 (3d Cir. 2010)                               6

18   *Cuviello v. City of Vallejo*, 944 F.3d 816 (9th Cir. 2019)                            10

19
     *Eberle v. Smith*, No. 07-CV-0120, 2008 WL 238450 (S.D. Cal. Jan. 29, 2008)           12
20
     *Fulmen Co. v. Offc. of Foreign Assets Control*, 547 F. Supp. 3d 13 (D.D.C. 2020)     2, 8-9
21

22   *Gentry v. Cellco Pshp.*, No. CV 05-7888, 2006 WL 6927883 (C.D. Cal. Mar. 22,
     2006)                                                                                  7, 8
23

     *GPAC, Inc. v. D.W.W. Enters., Inc.*, 144 F.R.D. 60 (D. N.J. 1992)                     10
24

25   *Hart v. Charter Comms., Inc.*, No. SA CV 17-0556, 2019 WL 7940684 (C.D. Cal.
     Aug. 1, 2019)                                                                          11

26   *Hassan v. United States*, No. CIV. S-12-1933, 2012 WL 6088314 (E.D. Cal. Dec. 6,
27   2012)                                                                                   6

28   *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728 (D.C. Cir. 2007)                  9

                                            -iii-

*Kang v. Credit Bureau Connection, Inc.*, No. 1:18-CV-01359, 2020 WL 2539292 (E.D. Cal. May 19, 2020) ............ 6

*Klaustech, Inc. v. AdMob, Inc.*, No. C 10-05899, 2011 WL 13152861 (N.D. Cal. Feb. 2, 2011) ............ 12

*Ponzio v. 3M Co.*, No. 2:16-CV-3521, 2016 WL 6407376 (C.D. Cal. Oct. 28, 2016) ............ 10

*NextG Networks of Cal., Inc. v. City of San Francisco*, No. C 05-0658, 2005 WL 8177903 (N.D. Cal. Jun. 7, 2005) ............ 9

*Reese v. Odwalla, Inc.*, 30 F. Supp. 3d 935 (N.D. Cal. 2014) ............ 9

*Reiter v. Cooper*, 507 U.S. 258 (1993) ............ 7

*Rent-A-Center, Inc. v. Canyon Tel. & Appliance Rental, Inc.*, 944 F.2d 597 (9th Cir. 1991) ............ 11

*Saubers v. Kashi Co.*, 39 F. Supp. 3d 1108 (S.D. Cal. 2014) ............ 2, 8

*Syntek Semiconductor Co. v. Microchip Tech.*, 307 F.3d 775 (9th Cir. 2002) ............ 7

*Terry v. Register Tapes Unlimited, Inc.*, No. 2:16-cv-0806, 2020 WL 3819417 (E.D. Cal. Jul. 8, 2020) ............ 11

*United States v. Shih*, 73 F.4th 1077 (9th Cir. 2023) ............ 3

*Williams v. Nationstar Mortgage, LLC*, No. 6:16-cv-01357, 2016 WL 6905382 (D. Or. Nov. 23, 2016) ............ 11

*Zaborowski v. MHN Govt. Servs., Inc.*, No. C 1205109, 2013 WL 1832638 (N.D. Cal. May 1, 2013) ............ 2, 12

DEFS.' MOT. TO STAY PENDING DETERMINATION BY OFFICE OF FOREIGN ASSETS CONTROL

**INTRODUCTION**

Plaintiff Semiconductor Global Solutions ("SGS"), a Chinese corporation in Shanghai, China, purchased semiconductor manufacturing equipment ("SME") from Defendant Capital Asset Exchange & Trading LLC ("CAET") with numerous potential military applications, including the manufacture of semiconductors used in radar, missile guidance, supercomputing and radiation-hardened electronics.  As U.S. Bureau of Industry and Security ("BIS") regulations restrict the export of the equipment SGS bought (the "Equipment"), and require CAET to "[t]ake into account any abnormal circumstances in a transaction that indicate that the export may be destined for an inappropriate end-use, end-user, or destination," 15 C.F.R. § 732, Supp. 3, § (a)(1), CAET did extensive due diligence regarding SGS.

During that investigation, CAET learned SGS is partially owned by another Chinese entity, Yangzhou SMIC Xicheng Xingsheng Venture Capital Partnership, which in turn is partially owned by Chinese semiconductor manufacturer Semiconductor Manufacturing International Corporation ("SMIC").  SMIC appears on both the "Non-SDN Chinese Military-Industrial Complex Companies List" maintained by the Treasury Department's Office of Foreign Assets Control ("OFAC"), and the BIS's "Entity List."  Those lists contain entities OFAC and BIS have determined to pose risks to U.S. national security, and SMIC appears on them due to its relationship with the Chinese military.  Thus, CAET determined that it could not lawfully deliver the Equipment to SGS.  Moreover, as BIS regulations also prohibit the "support" of any "military-intelligence end use" or "end user," including by "[p]erforming any contract, service or employment," 15 C.F.R. § 744.6(b)(5), CAET determined that it could not refund SGS's payment either, at least without a license from the appropriate regulatory agency.  Accordingly, on May 16, 2025, CAET submitted a request to OFAC for a license to refund SGS's payment.

CAET respectfully requests that the Court stay this action, based on the doctrine of primary jurisdiction, pending OFAC's response to CAET's request for a license to refund SGS's payment.  *See Barrera v. Comcast Holdings Corp.*, No. 14-cv-00343, 2014 WL 1942829, *2 (N.D. Cal. May 12, 2014) (entering stay on the ground that "the doctrine of primary jurisdiction applies because the very issue on which Plaintiff's claims are predicated — liability under the

[Telephone Consumer Protection Act] when a wireless telephone user has changed phone numbers — is currently before the" Federal Communications Commission). OFAC has special competence in the area of sanctions enforcement, and thus deference to its conclusions regarding the legality of CAET's transaction with SGS is warranted. *See Fulmen Co. v. Offc. of Foreign Assets Control*, 547 F. Supp. 3d 13, 23 (D.D.C. 2020) ("OFAC, in particular, is entitled to even greater deference" than a typical regulatory agency — "indeed, 'extreme[] deferen[ce]'" — because its decisions implicate national security and foreign policy"). Further, because CAET's decision not to proceed with the transaction or refund was based on OFAC and BIS regulations, OFAC's determination may substantially affect the disposition of this matter. *See, e.g., Saubers v. Kashi Co.,* 39 F. Supp. 3d 1108, 1112 (S.D. Cal. 2014) (as "Plaintiffs' claims rely heavily, if not entirely, on the premise that the FDA has concluded that 'evaporated cane juice' is not the common or usual name for any sweetener," and "the FDA's articulation of its considered view on this matter will undoubtedly affect issues being litigated in this action," "application of the primary jurisdiction doctrine is favored" and a stay was warranted).

A stay is also appropriate pursuant to the Court's inherent power to manage its docket, as a stay will promote efficiency by avoiding the risk that the Court and OFAC will make inconsistent determinations regarding the applicable regulations, and, given the early stage of this case (no discovery has been done and no trial date has been set), will not prejudice SGS. *See, e.g., Zaborowski v. MHN Govt. Servs., Inc.,* No. C 1205109, 2013 WL 1832638, *3 (N.D. Cal. May 1, 2013) (stay pending appeal pursuant to court's inherent power would serve "the public interest" because "judicial resources will be wasted if this case proceeds all the way to trial, only for the Court to later discover that the case should have proceeded through arbitration").

## STATEMENT OF FACTS

### A.  The Relevant U.S. Export Regulations

#### 1.  The BIS maintains a list of entities that cannot receive certain types of equipment without a license

"The Export Administration Regulations ('EARs'), administered by the Department of Commerce's Bureau of Industry and Security ('BIS'), impose controls on certain exports to

1  'serve the national security, foreign policy, nonproliferation of weapons of mass destruction, and

2  other interests of the United States.'" *United States v. Shih*, 73 F.4th 1077, 1089 (9th Cir. 2023)

3  (quoting 15 C.F.R. §§ 730.1, 730.6). "Most items subject to the EARs are identified on a BIS

4  Commerce Control List and given an Export Control Classification Number ('ECCN')." *Id.* at

5  1090 (citing 15 C.F.R. § 774, Supp. No. 1).

6       The equipment SGS purchased from CAET consisted of a Hitachi S-9380 Type II

7  Scanning Electron Microscope, and a Hitachi S-9380 Critical Dimension Scanning Electron

8  Microscope. (Decl. of Ryan Jacob, May 28, 2025 ("Jacob Decl."), ¶ 3 & Exhs. A, B.) In

9  semiconductor manufacturing, scanning electron microscopes ("SEMs") are used to measure

10 nanoscale features on semiconductor wafers. (*Id.* ¶ 8.) Per the EARs, SEMs fall under Export

11 Control Classification Number ("ECCN") 3B992 ("Equipment not controlled by 3B002, 3B993,

12 or 3B994, for the inspection or testing of electronic 'components' and materials . . . and 'specially

13 designed' 'parts,' 'components' and 'accessories' therefor"). 15 C.F.R. § 774, Supp. No. 1, Cat.

14 3. The Equipment has numerous potential military applications, including the manufacture of

15 semiconductors used in radar, missile guidance, supercomputing and radiation-hardened

16 electronics. (Jacob Decl. ¶ 9.)

17       The BIS "maintains [an] 'Entity List,' which includes foreign persons 'reasonably

18 believed to be involved, or to pose a significant risk of being or becoming involved, in activities

19 contrary to the national security or foreign policy interests of the United States.'" *Changji Esquel*

20 *Textile Co. v. Raimondo*, 573 F. Supp. 3d 104, 108 (D.D.C. 2021) (internal quotation marks

21 omitted). "Listed entities are 'prohibited from receiving some or all items subject to the EARs

22 unless the exporter secures a license.'" *Id.* at 109. Except for "items 'necessary to detect,

23 identify and treat infectious disease,'" "all other license applications are presumptively denied for

24 most items." *Id.* (citing 85 Fed. Reg. at 44,160).

### 2.   The EARs prohibit the export of any item subject to the EARs to semiconductor manufacturers in China

25

26

27       The EARs prohibit, without a license, the export of an item subject to the EARs such as

28 the Equipment, if the exporter knows the item is "destined for . . . [s]emiconductor manufacturing

equipment (SME)" in a country in "Country Group D:5," which includes China, "for the 'development' or 'production' of 'equipment,' 'components,' 'assemblies,' or 'accessories' specified in ECCN[] . . . 3B992," *i.e.*, the ECCN applicable to the Equipment.  15 C.F.R. § 744.23(a)(4)(i).  The expansive list of ECCNs in Section 744.23 generally includes "front end of line," or "FEOL," SME, meaning SME related to the first stage of semiconductor manufacturing, where transistors and other basic components are created on a silicon wafer.  Publicly available information makes clear that, in addition to refurbishing and selling FEOL equipment such as scanning electron microscopes, SGS "also develops and sells semiconductor equipment."  (Jacob Decl. ¶¶ 11-12 & Exh. C.)

### 3. The EARs prohibit payments to "military-intelligence end users"

Further, under the EARs, "no 'U.S. person' may, without a license from BIS, 'support' . . . . [a] 'military-intelligence end use' or a 'military-intelligence end user,' as defined in § 744.22(f), in . . . the People's Republic of China . . . ."  15 C.F.R. § 744.6(b)(5).  A "military-intelligence end use" includes "the 'development,' 'production,' operation, installation [of] . . ., or incorporation into, items described on the U.S. Munitions List (USML)," *id.* § 744.22(f)(1), which in turn includes hardware and software for the manufacture, guidance and detection of missiles and bombs, 22 C.F.R. § 121.1, Cat. IV(a).  "Support" is defined to mean, *inter alia*, "[p]erforming any contract, service, or employment you know may assist or benefit any of the end uses or end users described in paragraphs (b)(1) through (5) of this section," which include "military-intelligence end users," "including, but not limited to:  Ordering, buying, removing, concealing, storing, using, selling, loaning, disposing, servicing, financing, transporting, freight forwarding, or conducting negotiations in furtherance of."  15 C.F.R. § 744.6(b)(6)(iv).  Thus, a U.S. exporter is not only prohibited from selling restricted equipment to an entity on the Entity List without a license, but also may not "perform[] any contract" with, or otherwise provide "support" to, a "military-intelligence end user," and "supporting" includes activities such as performing under a contract, "servicing," "financing" and "conducting negotiations."

### 4. The EARs require CAET to inquire into the end use of restricted items

Under the EARs, "[y]ou may not, without a license, knowingly export, reexport, or

-4-

transfer (in-country) any item subject to the EAR to an end user or end use that is prohibited by part 744 of the EAR."  15 C.F.R. § 736.2(b)(5).  To comply, a seller of restricted equipment must, before completing a sale, "[d]ecide whether there are 'red flags'" associated with the transaction, which means "[t]ake into account any abnormal circumstances in a transaction that indicate that the export may be destined for an inappropriate end-use, end-user, or destination."  15 C.F.R. § 732, Supp. 3, § (a)(1).  "If there are 'red flags,'" the seller has "a duty to check out the suspicious circumstances and inquire about the end-use, end-user, or ultimate country of destination," including by "obtain[ing] documentary evidence concerning the transaction."  *Id.* § (a)(2).  "If the 'red flags' cannot be explained or justified and you proceed, you run the risk of having had 'knowledge' that would make your action a violation of the EAR."  *Id.* § (a)(5).

Further, BIS guidance makes clear that an "end user" refers to "[t]he ultimate end-user." In other words, under the EARs, if the seller of a restricted item is aware that the buyer is an intermediary likely to resell the item to a prohibited end user (*e.g.*, a military intelligence end user in China), the seller cannot make the sale without a license.  *See, e.g.,* 15 C.F.R. § 732.1(b)(3) ("The ultimate end-user of your item cannot be a bad end-user."); *id.* § 732.1(b)(4) ("The ultimate end-use of your item cannot be a bad end-use."); *see also* 15 C.F.R. § 732, Supp. 3 (citing, as an example of a "red flag," a situation in which "[a]n exporter, reexporter, or transferor receives an order for which the ultimate owner or user of the items is uncertain, such as a request to ship equipment for developing or producing integrated circuits to a distributor without a manufacturing operation").

### 5.  OFAC regulations prohibit the transfer of funds to entities considered threats to U.S. national security

"OFAC is an executive agency of the United States Department of the Treasury that administers and enforces economic trade sanctions based on United States foreign policy and national security goals against threats to national security, foreign policy, and the national economy. . . . OFAC's sanctions are directed towards terrorists, international narcotics traffickers, and persons involved in the proliferation of weapons of mass destruction, amongst others. . . . OFAC designates some of these individuals as Specially Designated Nationals and Blocked

1   Persons ('SDNs'), and OFAC periodically publishes and updates its list of SDNs on its 'SDN

2   List,'" among other lists of sanctioned entities maintained by OFAC, "which is publicly available

3   online." *Kang v. Credit Bureau Connection, Inc.*, No. 1:18-CV-01359, 2020 WL 2539292, *1

4   (E.D. Cal. May 19, 2020) (citing 31 C.F.R. § Ch. V, App. A).

5            **B.  The Parties' Transaction**

6            As of, respectively, November 28, 2022 and December 7, 2022, the parties executed an

7   "Invoice Order" and a "Purchase Order" providing that SGS would purchase the Equipment.

8   (Jacob Decl. ¶ 4 & Exhs. A, B.)  SGS agreed to pay, and paid, CAET a total of $2,000,000 in

9   exchange for the Equipment.  (*Id.* ¶ 7.)

10           Because the items SGS purchased, as discussed, are subject to the EARs, CAET

11  performed extensive due diligence regarding SGS, including an investigation of SGS's ownership

12  structure.  (*Id.* ¶ 10.)  During its investigation, CAET discovered that SGS is partially owned by a

13  Chinese entity called Yangzhou SMIC Xicheng Xingsheng Venture Capital Partnership, which in

14  turn is partially owned by SMIC.  (*Id.* ¶¶ 13-15 & Exh. D.)  SMIC is a partially state-owned

15  Chinese semiconductor foundry, *i.e.*, a producer of integrated circuits.  (*Id.* ¶ 14.)  SMIC is on the

16  OFAC Non-SDN Chinese Military-Industrial Complex Companies List due to its suspected

17  relationship with the Chinese military, and is also on the BIS Entity List.  (*Id.* ¶ 17 & Exh. F; *see*

18  *also* 15 C.F.R. § 744, Supp. No. 4.)  Further, SMIC is a "front end of line" equipment

19  manufacturer, and thus SME cannot be exported to SMIC without a license from the BIS.  *See* 15

20  C.F.R. § 744.23(a)(4)(i).

21           Based on its investigation, CAET determined that, due to the risk that SGS might transfer

22  the Equipment to SMIC or an entity affiliated with it, CAET could not deliver the Equipment to

23  SGS.  (Jacob Decl. ¶ 18.)  CAET also determined that, in light of, among other regulations, 15

24  C.F.R. § 744.6(b)(5)'s above-mentioned prohibition on "supporting" "military intelligence end

25  users" (which includes a prohibition on "[p]erforming any contract, service or employment you

26  know may assist or benefit any" military intelligence "end uses or end users"), refunding SGS's

27  payment would also be prohibited, at least without a license from the appropriate export

28  regulator.  (*Id.* ¶ 19.)  After CAET told SGS as much, SGS brought this action.

On May 16, 2025, CAET applied to OFAC for a license to refund SGS's payment.  (*Id.* ¶ 20.)  OFAC has not yet taken any action regarding CAET's application.  (*Id.*)

## ARGUMENT

### I.     THIS ACTION SHOULD BE STAYED BASED ON THE PRIMARY JURISDICTION DOCTRINE

CAET requests that the Court stay this action until OFAC has made a determination regarding CAET's application for a license to refund SGS's payment.  Such a stay is proper under the primary jurisdiction doctrine, which "is invoked to stay matters properly cognizable before a court while the resolution of a relevant or determinative issue within the special competence of an administrative agency is decided."  *Gentry v. Cellco Pshp.*, No. CV 05-7888, 2006 WL 6927883, *2 (C.D. Cal. Mar. 22, 2006) (citing *Reiter v. Cooper*, 507 U.S. 258, 268 (1993)).  In determining "whether to stay an action under the doctrine," "courts in this Circuit consider the following factors:  (1) the need to resolve the issue; (2) whether the issue has been placed by Congress within the jurisdiction of an administrative body having regulatory authority pursuant to a statute that subjects an industry or activity to comprehensive regulation; and (3) whether that regulation requires expertise or uniformity in administration."  *Id.* at *3 (citing *Syntek Semiconductor Co. v. Microchip Tech.*, 307 F.3d 775, 781 (9th Cir. 2002)).  These factors support entering a stay.

#### A.  OFAC's Determination Will Resolve an Issue Important to This Matter

If OFAC denies CAET's request for a license to refund SGS's payment, or issues an advisory opinion saying CAET cannot do so, that will substantially resolve the issue of whether export regulations permit CAET to issue the refund.  Thus, OFAC's determination is plainly important to the resolution of this case.  *See Clark v. Time Warner Cable,* 523 F.3d 1110, 1115-16 (9th Cir. 2008) (as "Congress has specifically delegated responsibility to the FCC to define 'slamming' violations, . . . and to prescribe the procedures for imposing the appropriate penalties," and "[t]he question raised by [plaintiff's] complaint — whether a VoIP provider qualifies as a 'telecommunications carrier' or is otherwise subject to § 258(a)'s requirements — fits squarely within that delegation," "the primary jurisdiction doctrine provided the district court with the authority to refer [plaintiff's] claim to the FCC"); *Saubers v. Kashi Co.,* 39 F. Supp. 3d

1108, 1112 (S.D. Cal. 2014) (as "Plaintiffs' claims rely heavily, if not entirely, on the premise

that the FDA has concluded that 'evaporated cane juice' is not the common or usual name for any

sweetener," and "the FDA's articulation of its considered view on this matter will undoubtedly

affect issues being litigated in this action," "application of the primary jurisdiction doctrine is

favored"); *Gentry*, 2006 WL 6927883, *3 ("need to resolve the issue" factor weighed in favor of

stay, as "[t]he resolution of whether ETFs are 'rates charged'" under Federal Communications

Act, which was within Federal Communications Commission's jurisdiction, "is critical to this

diversity action" because, "if ETFs in this case are interpreted to be 'rates charged' under the

FCA, then federal law preempts Plaintiffs' state law claims").

### B.  The Issue Presented by the License Application Is Within OFAC's Jurisdiction

In 1994, the President issued an Executive Order pursuant to his authority under the

International Emergency Economic Powers Act that "blocked all property and interests in

property of . . . any foreign person" who has "engaged, or attempted to engage, in activities or

transactions that have materially contributed to, or pose a risk of materially contributing to, the

proliferation of weapons of mass destruction or their means of delivery (including missiles

capable of delivering such weapons)," and those held by "any person determined by the Secretary

of the Treasury . . . to be owned or controlled by, or acting or purporting to act for or on behalf of,

directly or indirectly, any person whose property and interests in property are blocked pursuant to

this order." 70 Fed. Reg. at 38567.  "The Secretary" of the Treasury "in turn delegated that

authority to OFAC." *Fulmen Co. v. Offc. of Foreign Assets Control*, 547 F. Supp. 3d 13, 18

(D.D.C. 2020) (citing 31 C.F.R. §§ 539.802, 544.802).  In light of OFAC's authority to restrict

the transfer of property contributing to the development of weapons of mass destruction, and the

ability of the Equipment to be used in the production of missile guidance systems and other

military applications (Jacob Decl. ¶ 9), OFAC plainly has jurisdiction to regulate CAET's

potential return of the funds it received from SGS.

### C.  The Relevant Regulations Require Agency Expertise and Uniformity

Numerous courts have recognized OFAC's unique expertise in preventing the transfer of

funds likely to be used for purposes contrary to U.S. national security interests, and the

-8-

1  complexity of the regulations OFAC enforces.  *See Fulmen Co.*, 547 F. Supp. 3d at 23 ("OFAC,

2  in particular, is entitled to even greater deference" than a typical regulatory agency — "indeed,

3  'extreme[] deferen[ce]' — because its decisions implicate national security and foreign policy")

4  (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007)); *In re 650*

5  *Fifth Ave.*, No. 08 Civ. 10934, 2013 WL 2451067, *6 (S.D.N.Y. Jun. 6, 2013) ("Given OFAC's

6  unique expertise in matters of terrorist finance and the sensitive nature of the investigations upon

7  which OFAC makes its determinations, it is entitled to deference even greater than that afforded

8  an administrative agency statutory interpretation under *Chevron*," *i.e.*, *Chevron U.S.A. Inc. v.*

9  *Natural Resources Def. Council*, 467 U.S. 837 (1984)).

10       Thus, all of the primary jurisdiction factors support staying this matter pending a response

11  from OFAC to CAET's license application.  *See Reese v. Odwalla, Inc.*, 30 F. Supp. 3d 935, 941

12  (N.D. Cal. 2014) (as "the dispute to be resolved is" whether "use of" a particular "ingredient

13  name is misleading and prohibited under the" Food, Drug and Cosmetic Act, and "[t]he issue of

14  proper declaration of ingredients on food labels is one as to which Congress vested the FDA with

15  comprehensive regulatory authority," staying case under primary jurisdiction doctrine); *Barrera*

16  *v. Comcast Holdings Corp.*, No. 14-cv-00343, 2014 WL 1942829, *2 (N.D. Cal. May 12, 2014)

17  (entering stay on the ground that "the doctrine of primary jurisdiction applies because the very

18  issue on which Plaintiff's claims are predicated — liability under the [Telephone Consumer

19  Protection Act] when a wireless telephone user has changed phone numbers — is currently before

20  the" Federal Communications Commission); *NextG Networks of Cal., Inc. v. City of San*

21  *Francisco*, No. C 05-0658, 2005 WL 8177903, *5 (N.D. Cal. Jun. 7, 2005) (because California

22  Public Utilities Commission ("PUC") "has primary jurisdiction to consider whether radio

23  frequency transport service is within the scope of" plaintiff's "certificate of public convenience

24  and necessity" issued by that agency, staying case pending PUC's determination of that issue).

25  Further, a stay would promote judicial efficiency because, if the Court declines to issue a stay and

26  requires CAET to refund SGS's payment, guidance from OFAC prohibiting CAET's payment to

27  SGS could require the Court's order to be reopened.

28

1    **II.    THIS ACTION SHOULD BE STAYED BASED ON THE COURT'S DISCRETION**
2    **TO CONTROL ITS DOCKET**

3        Even assuming the primary jurisdiction doctrine does not apply, the Court has "broad

4    discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v.*

5    *Jones,* 520 U.S. 681, 707-08 (1997).  "In determining whether to grant a stay, courts generally

6    consider whether doing so would 'cause undue prejudice or present a clear tactical disadvantage

7    to the non-moving party.' . . . . Other factors considered are 'the stage in the litigation, [whether]

8    discovery [is] or [will] be almost completed, [and whether] the matter [has] been marked for

9    trial.'"  *ASCII Corp. v. STD Ent'mt. USA, Inc.*, 844 F. Supp. 1378, 1380 (N.D. Cal. 1994)

10   (quoting *GPAC, Inc. v. D.W.W. Enters., Inc.*, 144 F.R.D. 60, 63-64 (D. N.J. 1992)).  These factors

11   also support a stay.

12       **A.    If the Court Requires CAET to Refund SGS's Payment, CAET May Be Forced to**
13       **Violate U.S. Export Regulations**

14       If the Court directs CAET to refund SGS's payment before CAET has the opportunity to

15   consult with OFAC regarding the refund's legality, CAET may be forced to violate OFAC or BIS

16   regulations.  Transacting with entities sanctioned by OFAC can result in criminal and civil

17   penalties, including fines and imprisonment.  *See* 31 C.F.R. § 501.701(a).  The same is true of

18   exporting items in violation of the EARs.  *See* 50 U.S.C. § 4819(a)(2)(A) ("No person may

19   engage in any conduct prohibited by or contrary to, or refrain from engaging in any conduct

20   required by . . . the Export Administration Regulations," and a person who does so "shall be fined

21   not more than $1,000,000; and, . . . . in the case of [an] individual, shall be imprisoned for not

22   more than 20 years, or both."); *see also Ponzio v. 3M Co.*, No. 2:16-CV-3521, 2016 WL

23   6407376, *1 n.1 (C.D. Cal. Oct. 28, 2016) (describing criminal and civil penalties under EARs).

24       It is well-established that the risk of incurring criminal penalties gives rise to a threat of

25   irreparable harm.  *See Cuviello v. City of Vallejo,* 944 F.3d 816, 832 (9th Cir. 2019) (as failure to

26   comply with city's municipal code "constitutes either a misdemeanor or infraction, subject to

27   potential criminal penalties," plaintiff "has shown irreparable harm" necessary to enjoin

28   enforcement of ordinance); *Chamber of Commerce v. Becerra*, 438 F. Supp. 3d 1078, 1103-04

-10-

1   (E.D. Cal. 2020) (plaintiffs seeking injunction preventing enforcement of statute "meet their

2   burden of showing a likelihood of irreparable harm" because, if the statute "takes effect, plaintiffs

3   have provided sufficient evidence to show California businesses that rely on arbitration

4   agreements as a condition of employment will be forced to choose between risking criminal or

5   civil penalties, or both, . . . and foregoing the use of arbitration agreements altogether to avoid

6   penalties").

7          **B.  Entering a Stay Will Not Meaningfully Prejudice SGS**

8          To the extent SGS suffers any injury due to entry of a stay, it will be a mere delay in

9   receiving the funds it paid to CAET, unless OFAC advises that paying those funds is unlawful.

10  *See Terry v. Register Tapes Unlimited, Inc.,* No. 2:16-cv-0806, 2020 WL 3819417, *2 (E.D. Cal.

11  Jul. 8, 2020) (plaintiff's allegations of "personal hardship he will experience if he loses his

12  income from defendants" did not establish irreparable harm, because "[e]conomic harm is

13  generally not considered irreparable"); *Cal. Apt. Ass'n. v. San Diego Cty. Apt. Ass'n., Inc.*, No.

14  11cv300, 2011 WL 1002667, *2 (S.D. Cal. Mar. 18, 2011) (denying motion for temporary

15  restraining order preventing alleged copyright infringement because "economic injury alone does

16  not support a finding of irreparable harm, because such injury can be remedied by a damage

17  award") (quoting *Rent-A-Center, Inc. v. Canyon Tel. & Appliance Rental, Inc.*, 944 F.2d 597, 603

18  (9th Cir. 1991)).

19         Nor is mere delay in the conduct of the litigation sufficient to defeat a stay.  *See, e.g., Hart*

20  *v. Charter Comms., Inc.*, No. SA CV 17-0556, 2019 WL 7940684, *5 (C.D. Cal. Aug. 1, 2019)

21  ("Litigation delay does not generally constitute sufficient reason to deny an otherwise justified

22  stay of proceedings.").  Further, this case is at an early stage, as no discovery has been taken and

23  the pleadings are not yet settled.  (Decl. of William J. Frimel, May 28, 2025, ¶¶ 2-3.)  Thus, a stay

24  will not put the parties at risk of losing the benefit of significant trial preparations.  *See, e.g.,*

25  *Williams v. Nationstar Mortgage, LLC,* No. 6:16-cv-01357, 2016 WL 6905382, *2-3 (D. Or.

26  Nov. 23, 2016) (as "the case is in the early stages of the proceedings" and a stay "would reduce

27  the financial hardship defendant would sustain defending issues that could be rendered moot by

28  the" order in related appeal, stay was appropriate); *Klaustech, Inc. v. AdMob, Inc.*, No. C 10-

-11-

1    05899, 2011 WL 13152861, *2 (N.D. Cal. Feb. 2, 2011) ("[T]his case is in the early stage of

2    litigation and this factor weighs in favor of a stay" pending patent reexamination, as "little to no

3    discovery has taken place" and "no trial date has been set"); *Akeena Solar Inc. v. Zep Solar Inc.*,

4    No. C 09-05040, 2010 WL 1526388, *2 (N.D. Cal. Apr. 14, 2010) (same).

5         **C.  A Stay Would Be in the Public Interest**

6         As discussed (*see* Stmt. of Facts ("SOF") § A *supra*), the relevant BIS regulations, such as

7    the prohibition on providing "support" to foreign military intelligence end users, 15 C.F.R. §

8    744.6(b)(6)(iv), are geared toward protecting U.S. national security interests, SGS appears to have

9    ties with an entity recognized by U.S. regulators as posing threats to those interests (*see* SOF § B

10   *supra*), and OFAC's purpose is to regulate transactions that have significant national security

11   implications (SOF § A.5 *supra*).  Accordingly, entering a stay until OFAC has the opportunity to

12   evaluate any proposed payment by CAET to SGS would be in the public interest.  The requested

13   stay would also serve the goal of judicial efficiency, as it would cause a waste of judicial

14   resources if CAET refunded SGS's funds and OFAC later determined that CAET was not legally

15   permitted to do so.  *See Zaborowski v. MHN Govt. Servs., Inc.,* No. C 12–05109, 2013 WL

16   1832638, *3 (N.D. Cal. May 1, 2013) (stay pending appeal would serve "the public interest"

17   because "judicial resources will be wasted if this case proceeds all the way to trial, only for the

18   Court to later discover that the case should have proceeded through arbitration"); *Eberle v. Smith*,

19   No. 07-CV-0120, 2008 WL 238450, *4 (S.D. Cal. Jan. 29, 2008) (because "continuing to litigate

20   in this Court during the pendency of the appeal" at issue would pose a "risk of redundant or

21   inconsistent actions," "the public interest weighs in favor of a stay").

22                                  **CONCLUSION**

23        For the foregoing reasons, this case should be stayed until OFAC makes a determination

24   regarding CAET's request for a license to refund the payment made to CAET by SGS.

25

26

27

28

-12-

1    Dated:  May 28, 2025              /s/ William J. Frimel

2                                     WILLIAM J. FRIMEL
                                      Attorneys for Defendants
3                                     CAPITAL ASSET EXCHANGE & TRADING LLC,
                                      CAE ONLINE LLC, RYAN JACOB, and JEFFREY
4                                     ROBBINS

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFS.' MOT. TO STAY PENDING DETERMINATION BY OFFICE OF FOREIGN ASSETS CONTROL