1  WILLIAM J. FRIMEL (Bar No. 160287)
   Seubert Frimel & Warner LLP
2  1075 Curtis Street
3  Menlo Park, CA  94025
   Tel:  650.322.3048
4  Fax:  650.833.2976
   bill@sffwlaw.com
5

6  Attorneys for Defendants
   CAPITAL ASSET EXCHANGE & TRADING LLC,
7  CAE ONLINE LLC, RYAN JACOB, and JEFFREY
   ROBBINS
8

9  **UNITED STATES DISTRICT COURT**

10

11 **NORTHERN DISTRICT OF CALIFORNIA**

12

| SEMICONDUCTOR GLOBAL SOLUTIONS,<br><br>            Plaintiff,<br><br>       v.<br><br>CAPITAL ASSET EXCHANGE & TRADING LLC; CAE ONLINE LLC; RYAN FRANZKE JACOB, individually; and JEFFREY SCOTT ROBBINS, individually,<br><br>            Defendants. | Case No. 4:25-cv-04075-HSG<br><br>**DECLARATION OF RYAN JACOB IN SUPPORT OF MOTION BY DEFENDANTS CAPITAL ASSET EXCHANGE & TRADING LLC, CAE ONLINE LLC, RYAN JACOB, AND JEFFREY ROBBINS TO STAY ACTION PENDING DETERMINATION BY OFFICE OF FOREIGN ASSETS CONTROL**<br><br>Hearing Date:  July 31, 2025<br>Hearing Time:  2:00 p.m.<br>Courtroom:  2<br>Judge:  Hon. Haywood S. Gilliam, Jr. |
|---|---|

**DECLARATION OF RYAN JACOB**

1. I am the Chief Executive Officer of Defendant Capital Asset Exchange & Trading LLC ("CAET"). I have been in that position for seventeen years.

2. CAET purchases and sells used semiconductor manufacturing equipment ("SME"). I have personally acquired knowledge of the facts discussed below in the course of serving as CAET's Chief Executive Officer.

3. Plaintiff Semiconductor Global Solutions ("SGS") purchased semiconductor manufacturing equipment ("SME") from CAET consisting of a Hitachi S-9380 Type II Scanning Electron Microscope, and a Hitachi S-9380 Critical Dimension Scanning Electron Microscope (collectively, the "Equipment").

4. SGS executed an "Invoice Order," and both parties executed a "Purchase Order," in connection with SGS's above-described purchase.

5. Attached as Exhibit A is a true and correct copy of the Invoice Order executed by SGS in connection with its purchase of the Equipment.

6. Attached as Exhibit B is a true and correct copy of the Purchase Order executed by SGS in connection with its purchase of the Equipment.

7. SGS agreed to pay, and paid, CAET a total of $2,000,000 in exchange for the Equipment.

8. In the context of semiconductor manufacturing, scanning electron microscopes such as the Equipment are used to measure nanoscale features on semiconductor wafers.

9. The Equipment has numerous potential military applications, including the manufacture of semiconductors used in radar, missile guidance, supercomputing and radiation-hardened electronics.

10. Because the items SGS purchased are subject to the Bureau of Industry and Security ("BIS") Export Administration Regulations ("EARs"), CAET performed extensive due diligence regarding SGS, including an investigation of SGS's ownership structure.

11. Publicly available information makes clear that, in addition to refurbishing and selling "front end of line" equipment — *i.e.*, equipment relating to the first stage of the

1  semiconductor manufacturing process — such as scanning electron microscopes, SGS also
2  manufactures and sells semiconductor equipment.
3     12.    Attached as Exhibit C is a true and correct copy of a page from the website of
4  CBInsights, a business intelligence provider, which is viewable at
5  https://www.cbinsights.com/company/semiconductor-global-solutions as of the date of this
6  declaration.
7     13.    Further, CAET discovered that SGS is partially owned by a Chinese entity called
8  Yangzhou SMIC Xicheng Xingsheng Venture Capital Partnership, which in turn is partially
9  owned by Semiconductor Manufacturing International Corporation ("SMIC").
10    14.    SMIC is a partially state-owned Chinese semiconductor foundry, *i.e.*, a producer of
11 integrated circuits, which is on the Office of Foreign Assets Control ("OFAC") Non-SDN
12 Chinese Military-Industrial Complex Companies List (the "Chinese Military List") due to its
13 suspected relationship with the Chinese military, and is also on the BIS Entity List, which
14 contains entities believed by the BIS to pose a risk to U.S. national security interests.
15    15.    Attached as Exhibit D is a true and correct copy of an excerpt from the website of
16 Qichacha, which is China's largest business information platform, concerning SGS.
17    16.    Attached as Exhibit E is a true and correct copy of the current OFAC Chinese
18 Military List.
19    17.    Attached as Exhibit F is a true and correct copy of a press release issued by the
20 BIS on December 18, 2020, which can also be viewed at https://2017-
21 2021.commerce.gov/news/press-releases/2020/12/commerce-adds-chinas-smic-entity-list-
22 restricting-access-key-enabling.html as of the date of this declaration.
23    18.    Based on its investigation, CAET determined that, due to the risk that SGS might
24 transfer the Equipment to SMIC or an entity affiliated with it, CAET could not deliver the
25 Equipment to SGS.
26    19.    CAET also determined that, in light of, among other regulations, 15 C.F.R. §
27 744.6(b)(5)'s prohibition on "supporting" "military intelligence end users" (which includes a
28 prohibition on "[p]erforming any contract, service or employment you know may assist or benefit

any" military intelligence "end uses or end users"), refunding SGS's payment would also be prohibited, at least without a license from the appropriate export regulator.

20. On May 16, 2025, CAET applied to OFAC for a license to refund SGS's payment. OFAC has not yet taken any action regarding CAET's application.

21. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 5/28/2025

RYAN JACOB