UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SEMICONDUCTOR GLOBAL SOLUTIONS,

Plaintiff,

v.

CAPITAL ASSET EXCHANGE AND TRADING, LLC, et al.,

Defendants.

Case No.  25-cv-04075-HSG

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; AND DEFERRING RULING ON DEFENDANTS' MOTION TO STAY**

Re: Dkt. Nos. 27, 37

Pending before the Court is a motion to dismiss filed by Defendants Capital Asset Exchange and Trading, LLC ("CAET"), CAE Online LLC ("CAEO"), Ryan Franzke Jacob ("Mr. Jacob"), and Jeffrey Scott Robbins ("Mr. Robbins") (collectively, "Defendants").  Defendants seek to dismiss certain causes of action alleged in Plaintiff's First Amended Complaint.  Motion to Dismiss ("Mot. to Dismiss"), Dkt. No. 27; First Amended Complaint ("FAC"), Dkt. No. 15. Defendants also seek to stay this action pending the determination by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") regarding CAET's purported application for a license to refund the payment at issue in this action.  Motion to Stay ("Mot. to Stay"), Dkt. No. 37.

For the reasons set forth below, the Court GRANTS Defendants' partial motion to dismiss with leave to amend and DEFERS ruling on Defendants' motion to stay pending a status report from Defendants.

## I.    BACKGROUND

### A.    The Parties

Plaintiff Semiconductor Global Solutions ("Plaintiff" or "SGS") is a private venture-

capital backed company that provides comprehensive upgrade and optimization solutions for used or refurbished semiconductor equipment. FAC, ¶ 10. It was founded in 2018, and its principal place of business is in the People's Republic of China. FAC, ¶¶ 1, 10. In 2018, it was publicly reported in China that SMIC International Holdings Limited ("SIHL") has been an investor in Plaintiff since Plaintiff's inception. FAC, ¶ 11. SIHL's parent company is Semiconductor Manufacturing International Corporation ("SMIC"). According to the FAC, SIMC is "widely known" to be a partially state-owned publicly listed Chinese pure-play semiconductor foundry company. *Id.* It is also the largest contract chipmaker in mainland China, and as such, is a partially regulated entity under certain United States regulations. *Id.*

Plaintiff SGS alleges that Defendant CAET and its distribution arm CAEO (collectively, "CAE") together constitute a "global physical commodities trading firm addressing the secondary semiconductor market." FAC, ¶ 12. SGS alleges that Defendants CAET and CAEO are "in the business of reselling used industrial equipment to customers in the semiconductor market." *Id.* According to SGS, Defendants Jacob and Robbins both have the title of "President, Managing Member" of CAE, and they are the alter-egos of CAE. FAC, ¶¶ 4-5. SGS also alleges that both CAE entities are headquartered in Austin, Texas and use one website, "Caeonline.com," which identifies Austin as "CAE Texas HQ" and announces that "[r]egardless of physical location, department, working from one of our offices remotely . . . all CAE employees are a part of our integrated network . . . We operate as a single unit." FAC, ¶ 14.

SGS alleges that on the "Caeonline.com" website, CAE represents that through its "rigorous diligence, compliance, logistics, and price matching," it "deliver[s] safety, results, and superior financial outcomes[.]" FAC, ¶ 20. In addition, SGS alleges that according to this website, CAE "marshals a tailored due diligence process, robust compliance, and risk management, [and] internal physical logistics" to "provide[] a uniquely safe and secure transaction." *Id.* SGS alleges that the website touts that CAE is "accountable for every transaction—we audit or inspect every asset and make sure it shows up as promised. CAE seeks to remove the risks associated with sourcing and monetizing physical assets in its market." *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

### B.    Plaintiff's Allegations

The FAC alleges that SGS contacted CAE for its secondhand equipment needs at some point prior to October 2021.[1]  FAC, ¶ 21.  SGS and CAE engaged in twelve transactions "without issue" between October 2021 and July 2022.  FAC, ¶ 22.  CAE "never raised any red flags" throughout the parties' dealings.  *Id.*

In December 2022, SGS was in the market for two used or salvaged scanning electron microscopes (the "Equipment") for refurbishing and resale to an end-user located in China.  FAC, ¶ 23.  SGS reached out to CAE to find suitable equipment for a specified budget of $2 million.  FAC, ¶ 24.  CAE then issued to SGS an invoice order on or around November 29, 2022.  *Id.*  At some point "[s]oon thereafter," CAE advised that it had located the desired equipment and invited SGS to place a bid for its purchase.  FAC, ¶ 25.  SGS placed a $2 million bid, which CAE accepted.  FAC, ¶¶ 25-26.  SGS alleges that "a new contract was formed on December 7, 2022— the Purchase Order."  FAC, ¶ 26.  Austin Gill, who SGS alleges is the Chief Operating Officer and Executive Vice President of CAE, signed the Purchase Order on behalf of CAE.  FAC, ¶¶ 6, 26.

Gergely Tóth, a Specialist for the Settlement and Compliance Department of CAE, and Andrew Hung, an Account Executive for CAE, advised SGS that SGS had won its bid, and "they again assured SGS that the Equipment could be delivered by CAE to China within three days of purchase[.]"  FAC, ¶¶ 6, 27.  SGS alleges that the Purchase Order provides that CAE was to sell and deliver the Equipment to SGS, with a delivery date of December 10, 2022.  FAC, ¶ 27.  SGS alleges that CAE made its representations "to solicit an upfront payment from SGS of the full $2,000,000 purchase price."  FAC, ¶ 28.  SGS thus "pre-paid CAE $2,000,000 on December 9, 2022," one day before the Purchase Order's delivery date.  FAC, ¶ 29.  CAE failed to deliver the Equipment by that date.  *Id.*

On or about December 13, 2022, CAE requested that SGS complete two forms before the Equipment could be exported; SGS promptly complied.  FAC, ¶ 30.  Throughout January, CAE advised SGS that CAE was engaged in the following:  "making arrangements for the removal of

---

[1] SGS does not distinguish between CAET and CAEO and refers to both collectively as "CAE" throughout its pleadings.  Accordingly, the Court adopts the term "CAE" to refer to both entities together.

the equipment" (January 6, 2023); completing a "logistics survey" before a delivery schedule could be provided (January 6, 2023); and "working with vendors to get the best crating quotation for the project" (January 17, 2023). FAC, ¶¶ 31-32. On February 1, 2023, CAE confirmed a decontamination, deinstallation, removal/transfer, inspection, and packing schedule for the first piece of Equipment, with a removal/transfer date of March 3, 2023. FAC, ¶ 33. Over the next two months, CAE engaged SGS in discussions about the process and cost of deinstallation and decontamination of the Equipment for export. FAC, ¶ 34. Given the "delays and vague information" provided by CAE, SGS requested to inspect the Equipment. FAC, ¶ 35. CAE "stalled," stating that the Equipment had already been de-installed, decontaminated, and locked down by its own personnel. FAC, ¶ 34. SGS then requested to inspect the Equipment for packing purposes, but CAE "refused to provide the exact location of the Equipment and denied SGS access under the guise of continued quality inspections." *Id.* In April 2023, CAE reported that "its compliance review was taking longer than expected." FAC, ¶ 35. CAE did not provide additional details. *Id.*

By mid-May 2023, SGS notified CAE that the end-user for the Equipment was "ready to back out." FAC, ¶ 36. CAE indicated that "it was still working on compliance issues." *Id.* The original end-user for the Equipment terminated its agreement with SGS. FAC, ¶ 37. On June 8, 2023, SGS advised CAE that if CAE were unable to perform, SGS would require a refund of its purchase price. FAC, ¶ 37. CAE advised that "it was still working on compliance." *Id.*

By July 2023, SGS secured a new potential end-user in Singapore and submitted the required paperwork to CAE at its request. FAC, ¶ 38. On August 9, 2023, CAE reported to SGS that "their alleged compliance hurdles involved the previous end user, and CAE expected the process to go more quickly moving forward." *Id.* However, no progress was made for the next two months. *Id.* When SGS proposed taking possession of the Equipment in the United States, CAE refused. FAC, ¶ 39.

On October 2023, SGS again advised CAE that if CAE could not complete its compliance review and release the Equipment to SGS, SGS would require a refund of its $2 million purchase price and restitution for the 10-month delay caused by CAE. FAC, ¶ 40. SGS again requested

4

proof of the existence and functionality of the Equipment; CAE refused to allow SGS to inspect the Equipment. *Id.*

In December 2023, one year after contracting with SGS, CAE explicitly refused to perform, citing export control restrictions and regulations. FAC, ¶ 41. On March 16, 2024, SGS issued a formal demand to CAE seeking delivery of the Equipment no later than March 29, 2024, or a refund. FAC, ¶ 42. CAE "pivoted to assert SGS' affiliation with SMIC as the basis" for their refusal to perform. *Id.*

SGS now brings the following claims against all Defendants: (1) breach of contract; (2) repudiation / anticipatory repudiation (in the alternative); (3) promissory estoppel (in the alternative); (4) fraudulent inducement and fraudulent misrepresentation; and (5) unjust enrichment (in the alternative). FAC, ¶¶ 45-79.

### C.    Procedural History

On August 14, 2024, SGS filed its initial complaint against all Defendants in the U.S. District Court for the Western District of Texas. Complaint, Dkt. No. 1. SGS amended its complaint, *see* FAC, Dkt. No. 15, and Defendants moved to transfer venue to the Northern District of California, or, in the alternative, to dismiss certain of SGS's claims. Dkt. No. 17. On May 1, 2025, the Western District of Texas granted Defendants' motion to transfer venue to this Court. Dkt. No. 21.

Defendants now move to dismiss (a) SGS's claims for promissory estoppel, fraudulent inducement and fraudulent misrepresentation, and unjust enrichment as to all Defendants; (b) SGS's claims for breach of contract and repudiation as to Defendant CAEO; and (c) all claims as to the individual Defendants, Mr. Jacob and Mr. Robbins. Dkt. No. 27. The motion is fully briefed and has been submitted. Dkt. No. 49. Pursuant to the doctrine of primary jurisdiction, as well as this Court's inherent power to manage its docket, Defendants also move to stay this action pending a determination by OFAC regarding CAET's application for a license to refund the payment made by SGS. Dkt. No. 37.

United States District Court
Northern District of California

## II.    LEGAL STANDARD

### A.    Motion to Stay

The doctrine of primary jurisdiction "requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling." *Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1173 (9th Cir. 2002) (citing *Reiter v. Cooper*, 507 U.S. 258, 268 (1993)).  Such a referral "does not deprive the court of jurisdiction; it has discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." *Id.* (citation omitted).  "Primary jurisdiction is properly invoked when a claim is cognizable in federal court but requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency." *Id.* at 1172 (citing *Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 442 (1907)).  "The doctrine applies when protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *Id.* (citing *United States v. General Dynamics Corp.*, 828 F.2d 1356, 1365 (9th Cir. 1987)).

Critically, "[t]he doctrine does not require that all claims within an agency's purview be decided by the agency." *Id.*  "Nor is it intended to 'secure expert advice' for the courts from regulatory agencies every time a court is presented with an issue conceivably within the agency's ambit." *Id.* (citing *General Dynamics Corp.*, 828 F.2d at 1365).  Rather, "primary jurisdiction is properly invoked when a case presents a far-reaching question that 'requires expertise or uniformity in administration.'" *Id.* (citation omitted).

Separately, the Court also has "discretionary power to stay proceedings in its own court." *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1109 (9th Cir. 2005) (citing *Landis v. North American Co.*, 299 U.S. 248, 254 (1936)).  Before imposing what is known as a *Landis* stay, the Court considers three competing interests:  (1) "the possible damage which may result from the granting of a stay"; (2) "the hardship or inequity which a party may suffer in being required to go forward"; and (3) "the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *Id.*

### B.    Motion to Dismiss

Federal Rule of Civil Procedure 8(a) requires that a complaint contain 'a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Rule 12(b)(6).  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Ctr.*, 521 F.3d 1097, 11094 (9th Cir. 2008).  To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Nevertheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation and quotations omitted).

When fraud is an essential element of a claim, Rule 9(b) imposes a heightened pleading standard.  *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *see also Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003).  A plaintiff must identify "the who, what, when, where, and how" of the alleged conduct to provide defendants with sufficient information to defend against the charge." *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) (citation and quotations omitted).  However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. Rule 9(b).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Nevertheless,

7

United States District Court
Northern District of California

courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

Even if the court concludes that a 12(b)(6) motion should be granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (*en banc*) (quotation omitted).

## III. DISCUSSION

### A. Defendants' Motion to Stay

Defendants move to stay this action pending a determination by OFAC regarding CAET's asserted May 16, 2025 OFAC application for a license to refund the SGS's payment. Mot. to Stay at 7. Defendants argue that this action should be stayed based on (1) the primary jurisdiction doctrine, Mot. to Stay at 7-9; and (2) this Court's inherent power and "broad discretion" to control its own docket, Mot. to Stay at 10-12. The Court is not persuaded by Defendants' first argument but will defer ruling on whether to issue a *Landis* stay pending a status report from Defendants as to the status of Defendants' application to OFAC for a license.

First, as to Defendants' primary jurisdiction argument, *Brown v. MCI WorldCom Network Servs., Inc.* is instructive. In *Brown*, where the plaintiff brought suit against a telephone service provider for violating the tariff it had filed with the Federal Communications Commission, the Ninth Circuit reversed the district court's invocation of primary jurisdiction, reasoning that "[p]rimary jurisdiction is not implicated because a case presents a question, over which the FCC could have jurisdiction, *regarding the interpretation of a single tariff*. Rather, primary jurisdiction is properly invoked when a case presents a far-reaching question that 'requires expertise or uniformity in administration.'" 277 F.3d at 1172-73 (emphasis added). Put another way, whether the telephone service provider had violated the tariff it filed with the FCC involved "a straightforward interpretation" of the filed tariff that the district court was "competent to resolve" without resort to the FCC. *Id.* at 1173. That question was not the sort of "complex and far-reaching issue[] . . . properly within the FCC's primary jurisdiction," such as an issue "involv[ing]

8

technical or policy considerations within the agency's particular field of expertise"). *Id.* at 1172-73.

So too here. Just as the Ninth Circuit in *Brown* deemed the interpretation of a single tariff well within the competency of the district court, the issues raised by Defendants' OFAC application only implicate the interpretation of a handful of export control regulations as applied to Defendants' single license application. *Cf. Allnet Communication Serv., Inc. v. Nat'l Exch. Carrier Ass'n, Inc.*, 965 F.2d 1118, 1121 (D.C. Cir. 1992) (invocation of federal agency's primary jurisdiction appropriate where judicial resolution would preempt that agency from implementing policy decisions).

However, the Court will defer ruling on whether a *Landis* stay is appropriate pending a report from Defendants concerning the status of Defendants' application to OFAC for a license to issue a refund. While issuing a stay pending OFAC's determination of Defendants' license application to issue a refund to SGS would certainly simplify the issues in this action, *see Lockyer*, 398 F.3d at 1110, whether a *Landis* stay would result in "possible damage," or would result in "hardship or inequity" if one is not issued, may be affected by the status and timing of OFAC's determination, particularly given Defendants' representation that they filed this application approximately ten months ago.

### B.    Defendants' Partial Motion to Dismiss

Defendants now move to dismiss these claims: (1) SGS's first and second claims for breach of contract and repudiation as to CAEO; (2) all of SGS's claims as to the individual defendants Mr. Jacob and Mr. Robbins; (3) and SGS's third, fourth, and fifth claims for promissory estoppel, fraudulent inducement and fraudulent misrepresentation, and unjust enrichment as to all Defendants.

#### i.    CAEO is Not Party to the Invoice Order and Purchase Order

Defendants argue that SGS's contractual claims should be dismissed as to Defendant CAEO, because CAEO was not a party to the operative contract in this action. Mot. at 6. The Court agrees with Defendants.

As an initial matter, SGS did not attach copies of the Invoice Order or Purchase Order to

United States District Court
Northern District of California

either its initial Complaint or the FAC. Defendants do attach them, and SGS does not dispute the authenticity of either document. *See* Exhs. A, B to Declaration of Ryan Jacob ("Jacob Decl."), Dkt. No. 33. As it is well-established that "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without converting the motion into one for summary judgment, the Court considers the Invoice Order and Purchase Order in ruling on Defendants' motion to dismiss. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) ("when the plaintiff fails to introduce a pertinent document as part of his pleading, the defendant may introduce the exhibit as part of his motion attacking the pleading") (cleaned up).

The Parties dispute whether the Purchase Order or the Invoice Order is the operative contract in this action. However, neither the Invoice Order nor the Purchase Order refers to CAEO as a party to the transaction. SGS asserts in its opposition that the Invoice Order is printed on "CAE letterhead," *see* Plaintiff's Opposition to Motion to Dismiss ("Opp."), Dkt. No. 40 at 9, but the Invoice Order very clearly provides that the "Seller" is "Capital Asset Exchange and Trading, LLC" and refers to "CAET" throughout the invoice's terms. *See* Ex. A to Jacob Decl. At no point do any of the Invoice Order's terms refer to "CAEO" or "CAE Online." *See id.*

Similarly, the Purchase Order provides that the "Vendor" is "Capital Asset Exchange and Trading, LLC," and the stamped seal above the "Vendor Authorized Signature" line identifies "Capital Asset and Trading, LLC" below the large letters "CAE." *See* Ex. B to Jacob Decl. Nowhere does the Purchase Order refer to "CAEO" or "CAE Online." *See id.*

In its opposition, SGS insists that it "has more than adequately alleged that CAEO and CAET are one and the same as to this transaction, such that they are both bound." Opp. at 9 (citing FAC, ¶¶ 85-87). But the Court's review of those allegations reflects that they actually try to show that "Defendants Jacob and Robbins were the alter-egos of Defendants CAET and CAEO, collectively CAE," in that "Defendants Jacob and Robbins completely controlled, dominated, managed, and operated the other Defendants to suit their convenience and fraudulent purpose." FAC, ¶ 85. SGS's attempt to transform these conclusory and boilerplate allegations into allegations that CAET and CAEO are "one and the same as to this transaction" fails. *See Franklin*

10

*EWC, Inc. v. Hartford Fin. Servs. Grp., Inc.*, 488 F. Supp. 3d 904, 911-12 (N.D. Cal. 2020) (where plaintiffs had contract with subsidiary, but did not dispute lack of contract with parent company, "conclusory, boilerplate allegations" as to Defendants acting in concert with one another did not arise to allege specific injury traceable to parent company); *see also Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003) ("The properties of two corporations are distinct, though the same shareholders own or control both.").

Relevantly, SGS itself alleges that some distinction may exist between the two entities. *See, e.g.*, FAC, ¶ 86 (the individual Defendants "concentrate[d] the assets in one (CAEO) and the liabilities in another (CAET)"). Accordingly, absent any plausibly alleged contractual relationship with CAEO, Plaintiff's contractual claims against CAEO must be dismissed for failure to state a claim. "It is well established that, under California law, only a party to [a] contract may be held liable for breach of contract[.]" *Jones v. AIG Risk Mgmt.*, 726 F. Supp. 2d 1049, 1055 (N.D. Cal. Jul. 20, 1010) (citing *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 576 (1973)). In *Jones*, where two defendants were listed at the top of the operative contract seemingly for trademark and copyright purposes, but were nowhere referred to as parties to the contract, the court dismissed the plaintiff's contractual claims against those defendants under Rule 12(b)(6) for failing to establish more than a sheer possibility that those defendants were legal parties to the contract.[2] 726 F. Supp. 2d at 1055-56; *see also St. Vincent Med. Ctr. v. Mega Life and Health Ins. Co.*, 585 F. App'x 417, 417 (9th Cir. Oct. 10, 2014) ("The general rule in California is that 'only a signatory to a contract may be liable for any breach.") (citing *Clemens v. Am. Warranty Corp.*, 193 Cal. App. 3d 444, 452 (1987)); *Tri-Continent Int'l Corp. v. Paris Sav. & Loan Assoc.*, 12 Cal. App. 4th 1354, 1359 (1993) (a plaintiff "cannot assert a claim for breach of contract against one who is not a party to the contract").

---

[2] The Court recognizes that courts also "frequently dismiss contract-based claims against defendants that are not parties to the contract under Rule 12(b)(1) instead of Rule 12(b)(6)." *Founder Inst. Inc. v. Hartford Fire Ins. Co.*, 497 F. Supp. 3d 678, 679-80 (N.D. Cal. 2020); *see also Franklin EWC, Inc.*, 488 F. Supp. 3d at 912 (plaintiffs' claims against defendant's parent company, which was not party to contract, dismissed for lack of standing). However, in those instances, the motions to dismiss were made on the basis of lack of standing, rather than for failure to state a claim. And under either analysis, Plaintiff's claim here is subject to dismissal.

ii.    **SGS Has Inadequately Pled its Alter Ego Allegations Against Mr. Jacob and Mr. Robbins**

Defendants further argue that all claims should be dismissed as to Mr. Jacob and Mr. Robbins because SGS has inadequately pled that both are alter egos of the CAE entities. Mot. to Dismiss at 6-9. Specifically, Defendants argue that "[t]he FAC recites a list of generalized accusations" without any "factual detail regarding the conduct alleged." Mot. to Dismiss at 7. The Court agrees.

"A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities." *Ranza v. Nike*, 793 F.3d 1059, 1070 (9th Cir. 2015). "Corporate entities are presumed to have a separate existence, and the corporate form will be disregarded only when the ends of justice require this result." *Toho-Towa Co. v. Morgan Creek Prods., Inc.*, 217 Cal. App. 4th 1096, 1107 (2013); *see also Dole Food Co.*, 538 U.S. at 475 ("The doctrine of piercing the corporate veil, however, is the rare exception, applied in the case of fraud or certain other exceptional circumstances").

To determine whether a plaintiff has adequately pled alter ego liability, "courts start from the premise that alter ego is a limited doctrine, invoked only when recognition of the corporate form would work an injustice." *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 960 (N.D. Cal. 2015) (cleaned up). "California recognizes alter ego liability where two conditions are met: First, where 'there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased;' and second, where 'adherence to the fiction of the separate existence of the corporation . . . sanction a fraud or promote injustice.'" *In re Schwarzkopf*, 626 F.3d 1032, 1038 (9th Cir. 2010) (quoting *Wood v. Elling Corp.*, 572 P.2d 755, 761 n.9 (1977)).

As for the first condition, unity of interest and ownership is a fact-intensive analysis that requires the Court to:

Consider numerous factors, including inadequate capitalization, commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, use of one as a mere conduit for the affairs of the other, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers.

12

*Virtualmagic Asia, Inc. v. Fil-Cartoons, Inc.*, 99 Cal. App. 4th 228, 245 (2002). "No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine." *Id.*; *see also Bautista v. Juul Labs, Inc.*, No. 20-cv-01613-HSG, 2020 WL 7248320, at *3-4 (N.D. Cal. Dec. 18, 2020) (motion to dismiss granted where plaintiffs' allegations that one entity provided funding and shared an employee with another entity were "insufficient to overcome the presumption of respect for the corporate form").

Here, SGS fails to adequately allege *facts*, as opposed to boilerplate conclusions, showing disregard by the individual Defendants of the corporate forms of CAEO or CAET. *See, e.g.*, *Hudson v. Wells Fargo & Co.*, 2022 WL 2716526, at *4 (N.D. Cal. Jul. 13, 2022) (granting motion to dismiss where plaintiff failed to provide "sufficient factual support" beyond conclusory allegations that one entity exercised control over the management, hiring, company policies, and business strategy of another entity). Rather, SGS just recites the factors a court considers in assessing a claim of unity of interest and ownership:

> Specifically, at all times relevant hereto, Defendants Jacob and Robbins (a) controlled the business and affairs of CAE, including any and all of their affiliates; (b) commingled the funds and assets of the corporate entities, and diverted corporate funds and assets, including SGS' $2,000,000, for their own personal use or benefit; (c) disregarded legal formalities and failed to maintain arm's length relationships among the corporate entities; (d) inadequately capitalized CAE; (e) used the same office or business location and employed the same employees for all the corporate entities; (f) used the corporate entities as mere shells, instrumentalities or conduits for their fraudulent conduct; (g) manipulated the assets and liabilities between the corporate entities so as to concentrate the assets in one (CAEO) and the liabilities in another (CAET); and/or (h) used the corporate entities to shield against personal obligations, and in particular the obligations as alleged in this Complaint.

FAC, ¶ 86.

Accordingly, because SGS has not met the first condition to show alter ego liability as to Mr. Jacob and Mr. Robbins, all claims against them are dismissed. *See Reynolds v. Binance Holdings Ltd.*, 481 F. Supp. 3d 997, 1008 (N.D. Cal. 2020) ("Where a plaintiff fails to satisfy the 'unity of interest' prong, a court need not analyze the fraud or injustice prong.") (citation and quotations omitted).

        **iii.**    **SGS's Promissory Estoppel and Unjust Enrichment Claims May Not Proceed Given that the Parties Do Not Dispute the Validity of the Contract**

13

Defendants argue that SGS's promissory estoppel and unjust enrichment claims should be dismissed because both arise from an allegedly valid contract based on consideration. *See* Mot. to Dismiss at 9-10, 15-16. The Court agrees.

With respect to SGS's claim for promissory estoppel, it is well-established that "[u]nder California law, the same allegations that give rise to a breach of contract claim cannot also 'give rise to a claim for promissory estoppel, as the former [is] predicated on a promise involving bargained-for consideration, while the latter is predicated on a promise predicated on reliance in lieu of such consideration.'" Mot. to Dismiss at 9-10 (citing *JMP Secs. LLP v. Altair Nanotechnologies Inc.*, 880 F. Supp. 2d 1029, 1041 (N.D. Cal. 2012)); *see also Mobile Tech, Inc. v. Hitachi Sols. Am., Ltd.*, No. SACV2100461CJCADSX, 2021 WL 9747619, at *4 (C.D. Cal. Dec. 28, 2021) ("[I]t is well settled that an action for promissory estoppel cannot lie where a valid contract supported by consideration, governs the same subject matter as the alleged promise.").

SGS does not dispute this law. Accordingly, SGS asserts that this claim "is pled in the alternative," contending that where a defendant "may still challenge" the validity of the consideration and contracts underlying a breach of contract claim, a plaintiff may bring a claim for promissory estoppel in the alternative. Opp. at 15 (citing *Rowland v. JPMorgan Chase Bank*, N.A., No. 14-cv-00036-LG, 2014 WL 992005, at 7-8 (N.D. Cal. Mar. 12, 2014)). SGS insists that "[m]odern pleading practice allows a party to plead promissory estoppel in the alternative to breach of contract based on the same facts." Opp. at 15 (citing *Herbalife Int'l of Am., Inc. v. E. Comp. Exch., Inc.*, 723 F. Supp. 3d 888, 910 (C.D. Cal. 2024)).

SGS's authority, however, is easily distinguishable (and is not binding in any event). The Parties here do not dispute that a valid contract backed by consideration exists. *See* Mot. to Dismiss at 2 ("SGS's purchase of the Equipment was governed by a written contract that was undisputedly supported by consideration."); FAC, ¶ 26 ("a new contract was formed on December 7, 2022—the Purchase Order (the "Contract")). Nowhere do Plaintiffs "plead facts suggesting that the supposed contract between [them] and [Defendants] may be unenforceable or void[.]" *Beluca Ventures LLC v. Aktiebolag*, 622 F. Supp. 3d 806, 812-13 (N.D. Cal. 2022); *see also Cepelak v. HP Inc.*, No. 20-cv-02450-VC, 2021 WL 5298022, at *2 (N.D. Cal. Nov. 15, 2021) ("[T]o state a

14

claim for equitable relief, the plaintiffs must allege that they lack an adequate legal remedy."). In *Rowland*, the Defendant had not conceded this point. *See* 2014 WL 992005, at *7 ("If the parties entered into a contract as [P]laintiffs allege, then relief for promissory estoppel is unavailable."). In *Herbalife*, a dispute existed as to whether either party had provided bargained-for consideration. *See* 723 F. Supp. 3d at 910 ("Herbalife fails to establish the absence of genuine dispute regarding whether either party actually provided the alleged consideration.").

Accordingly, as neither party disputes the validity of the contract or the underlying consideration, SGS may not proceed on its promissory estoppel claim against all Defendants. To be sure, Plaintiffs have not adequately alleged that CAEO is the alter ego of CAET, or that Mr. Robbins and Mr. Jacob are the alter egos of the CAE entities, and so Defendants CAEO, Mr. Robbins, and Mr. Jacob do not appear to be covered by the contract. However, as the pleadings stand, SGS has not adequately alleged why it does not have an adequate remedy at law as to these Defendants.

Similarly, with respect to SGS's claim for unjust enrichment, which this Circuit has construed the common law to allow through quasi-contract, *see ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038-39 (9th Cir. 2016), such a claim is "does not lie when an enforceable, binding agreement exists defining the rights of the parties." *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996). Thus, for the same reason that SGS may not proceed on its promissory estoppel claim, SGS may not proceed on its unjust enrichment claim against all Defendants.

### iv.    SGS's Claim for Fraud Is Barred by the Economic Loss Doctrine

SGS's fraudulent inducement and misrepresentation theory is that Mr. Jacob and Mr. Robbins, through the CAE entities, made material misrepresentation(s) to SGS about Defendants' ability to perform the contract to induce SGS to enter the contract. FAC, ¶ 66. Defendants argue that SGS has failed to state a claim under this theory for two reasons:  first, SGS has failed to plead fraud with particularity, as required by Federal Rule of Civil Procedure 9(b); and second, the economic loss rule bars SGS's claim. Because the Court agrees that SGS's claim for fraud is barred by the economic loss rule, the Court does not reach the argument that SGS has failed to

15

plead fraud with particularity.

The economic loss rule states that "there is no recovery in tort for negligently inflicted 'purely economic losses,' meaning financial harm unaccompanied by physical or property damage." *Sheen v. Wells Fargo Bank, N.A.*, 12 Cal. 5th 905, 922 (2022). As Defendants point out, "[t]he purpose of the economic loss rule is to limit a plaintiff to 'recover[ing] in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." Mot. to Dismiss at 14 (citing *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004)). Defendants are correct that the economic loss rule does not permit SGS to base its fraud claim on Defendants' alleged failure to perform its contractual obligations. *See JMP Secs. LLP*, 880 F. Supp. 2d at 1043 (plaintiff's fraud and negligent representation claims barred where they consisted of "nothing more than [defendant's] alleged failure to make good on its contractual promises"); *see also Rattagan*, 17 Cal. 5th at 42 ("[A] plaintiff asserting a fraudulent concealment claim in the performance of a contract generally cannot demonstrate that the defendant violated a tort duty independent of the parties' contractual rights and obligations.").

On the other hand, Plaintiff is correct that fraud may still be pled in tandem with a contract claim if affirmative misrepresentations are used to induce a party into a contract, and if that fraud exposes the plaintiff to a risk of harm that the parties did not reasonably contemplate upon entering the contract. *See* Opp. at 20 (citing *Rattagan v. Uber Techs.*, 17 Cal. 5th 1, 8, 36 (2024)). As the California Supreme Court recently held, "a plaintiff may assert a cause of action for fraudulent concealment based on conduct occurring in the course of a contractual relationship, if the elements of the claim can be established independently of the parties' contractual rights and obligations *and* the tortious conduct exposes the plaintiff to a risk of harm beyond the reasonable contemplation of the parties when they entered into the contract." *Rattagan*, 17 Cal. 5th at 45 (emphasis added). However, "[a] plaintiff must base a fraudulent inducement claim on something other than simply an allegation that the plaintiff was induced to enter a contract by a promise that the defendant would perform its contractual obligations." *Mobile Tech., Inc. v. Hitachi Sols. Am., Ltd.*, No. SACV2100461CJCADSX, 2021 WL 9747619, at *5-6 (C.D. Cal. Dec. 28, 2021). In

United States District Court
Northern District of California

other words, the Defendant must make representations "extrinsic to a contract that induce the plaintiff to enter that contract." *Id.*

Here, the FAC alleges that Mr. Jacob and Mr. Robbins made "material misrepresentation(s) to SGS" that Defendants had already "secured the desired equipment" and possessed "a dedicated compliance department [that] was able to effectively address the Regulations, secure export licensing for the Equipment quicky, and export equipment to SGS' end-user in China." FAC, ¶ 66. According to SGS, these statements made to SGS "were false" and made "without any intent to perform" the contract. FAC, ¶¶ 69, 70. Even assuming without deciding that SGS has adequately pled an independent tort duty, it has not adequately pled that it was exposed to liability "beyond the reasonable contemplation of the parties that might result from a breach when they entered into their contract." *Rattagan*, 17 Cal. 5th at 45. That is, SGS has not alleged any harm or damage attributable to Defendants' alleged fraud that goes above and beyond purely economic loss. *See Little Seeds Children's Center, Inc. v. Citibank, N.A.*, No. 25-cv-01517-HSG, 2025 WL 3141496, at *5 (N.D. Cal. Nov. 10, 2025) (where only harm alleged was "stolen funds," such harm fell within the reasonable contemplation of the contract); *cf. Rattagan*, 17 Cal. 5th at 33-34 (a defendant's misrepresentations causing potential liability for personal injury or property damage represented harm above and beyond a broken contract). Because contract law comprehensively covers SGS's alleged harm, it may not proceed on its fraud claim against any of the Defendants.

## IV. CONCLUSION

The Court **GRANTS** Defendants' partial motion to dismiss, Dkt. No. 27, and **DEFERS** ruling on Defendants' motion to stay, Dkt. No. 37, pending a status report from Defendants concerning the status of Defendants' application to OFAC for a license to issue a refund to SGS. Defendants are ordered to file a status report within one week of the date of this order, by March 17, 2026.

//

//

//

17

Because granting SGS an opportunity to further amend the FAC would not be futile, cause undue delay, or unduly prejudice Defendants, and SGS has not acted in bad faith, the Court grants leave to amend. Any amended complaint is due within 21 days of the date of this order, March 31, 2026.

**IT IS SO ORDERED.**

Dated:  3/10/2026

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge

18